**James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**LIQUOR SALESMEN'S UNION, LOCAL NO. 2 of the State of New York, Distillery, Rectifying, Wine and Allied Workers' International Union of America, AFL–CIO, Defendant.**

No. 70 Civ. 2497.

United States District Court, S. D. New York.

May 17, 1971.

Whitney North Seymour, Jr., U. S.
Atty., by Daniel Riesel and Peter A. Her-

bert, Asst. U. S. Attys., New York City, Francis V. LaRuffa, R. Sol. N. Y. Region, Dept. of Labor, New York City, by Edward F. Beane for plaintiff.

Schulman, Abarbanel, Perkel & McEvoy, New York City, for defendant.

MOTLEY, District Judge.

### Findings of Fact and Conclusions of Law

This is an action by the Secretary of Labor to set aside the January 9, 1970 election of officers held by defendant, Liquor Salesmen's Union, Local No. 2, (the Union) and for an order directing defendant to hold a new election under the Secretary's supervision. 29 U.S.C. § 482(b), (c).

The action was commenced on June 12, 1970. This was within 60 days of the filing of a complaint on April 13, 1970 by Union members with the Secretary, complaining of violations of § 481(g) in the conduct of the election. 29 U.S.C. § 482(b). The action was filed after an investigation of the complaint by the Secretary and a finding by him of probable cause to believe that a violation of § 481(g) had occurred. 29 U.S.C. § 482(b).

The Secretary charges that Section 481(g) of Title 29, United States Code was violated in the conduct of the challenged election in two particulars:

1) The Union applied money received by way of dues, assessments or similar levy to promote the candidacy of certain persons in that it used the Union financed publication, the Journal, specifically, the December, 1969 and January, 1970 issues, to praise the incumbents and to criticize the opposition;

2) Money of an employer was applied to promote the candidacy of certain persons in that an employer, Anthony Magliocco, expressed his preference for the incumbents at a joint salesmen's meeting, a meeting held at the employer's expense.

The controversy here arises from the near successful efforts of a large group of dissident union members to depose long entrenched incumbents and the response of the incumbents to those efforts.

The Union is composed of approximately 1600 members. They are employed as salesmen by wholesalers, distillers and distributors of alcoholic beverages in the New York Metropolitan area. The Union is chartered by the Distillery, Rectifying, Wine and Allied Worker's International Union, AFL–CIO (the International). It was organized in 1937. Since that time Mortimer Brandenburg has been president. He is also the president of the International.

The insurgent group, known as the Joint Salesmen's Committee (JSC), was formed sometime in 1967 as a forum for discussion of the liquor industry and Union conditions. The activities of JSC beginning in 1968, and continuing through 1969, consisted largely of interviewing Local 2 members to ascertain their views, and of publishing a monthly newsletter, for which publication, funds were solicited. In 1969, JSC also filed two law suits against Local 2. One suit sought to recover some $960,000 in back commissions allegedly owed to Local 2 members. The other suit challenged the Union's pension plan.

Around July, 1969, JSC decided to run a slate of candidates against Local 2's incumbents. It began contacting Union members to gather support for the upcoming January, 1970 election. The battle lines between insurgents and incumbents were thus drawn, and the bitterness which usually attends such contests, as reflected in the literature of both sides, was not absent here.

In December, 1969, the acts of which the Secretary complains took place. At that time the Union sent out the December issue of its house organ, the *Journal*. The feature article in the issue, which, significantly, was received by the membership of Local 2 in the latter part of December, was written by the incumbent president, Mortimer Brandenburg. Much of the content of the article and, indeed, of the issue as a whole, was dedicated

to criticism of JSC and the lawsuits which JSC had filed. The incumbent Brandenburg stated in the article among other things:

"I am presenting this report on the state of our Union in the hope that the members of Local 2 will be better able, as a consequence, to assess our stewardship and to chart a course for the future.

This is our Union—yours and mine. The Union is the membership. It is deceit and artifice to separate Local 2 from the hopes and aspirations of its 1600 members. Yet there are elements and individuals who are trying to do just that—to create a chasm between the members and those who are privileged to serve them. These individuals cast aspersions upon the Union, dismissing it as only a vehicle for its officers and creating the impression that without a Union the liquor salesmen would be better off. They have even gone to the extent of filing a suit against the Union and its members, hoping that they can at one fell swoop collect close to a million dollars and destroy Local 2.

Well, I have news for these worthies. I did not become the head of Local 2 to preside over its liquidation. I am a trade unionist from the top of my head to the bottom of my feet. And for 35 years I have held fast to the conviction that the cause we are all bound together in Local 2—the cause of the liquor salesman—is worth our hearts and our minds and, yes, our knees, our elbows and our claws."

p. 1, cols. 1–2.

Mr. Brandenburg continued by stating that JSC action in filing a complaint with the New York District Attorney's Office regarding certain acknowledged irregularities between "the correlation of membership lists with records of payment of initiation fees" was "shafting" the Union to "gain political capital." "With savage vindictiveness they [press] . . . for blood . . ." the article said. (p. 3, cols. 1–2).

At another point, it said, "their (JSC's) concern (is) with what is politically expedient for them, not what is good for our Union." (Id. col. 2). At still another place, he said, "in these individuals human degradation reached a new low." (p. 4, col. 2).

The December as well as the January issue of the *Journal* excerpted testimony taken by the Union's lawyer upon the pre-trial depositions of certain of the leaders of JSC in the suit brought by them to recover alleged unpaid commissions. These excerpts were followed by editorial comments unfavorable to the JSC leaders.

In the January *Journal* incumbent Brandenburg wrote another article entitled, *The Choice Is Yours*, which reads as follows:

"On January 9—next Friday, between the hours of 2 and 6 PM—you will be called upon to make an important decision with regard to your future and and [sic] that of your Union.

\*    \*    \*    \*    \*    \*

Though I am a candidate for office, I do not propose to do any electioneering in this column, for as an official organ of Local 2 the *Journal* is above partisan, politics. There is the added consideration that having been elected unanimously to the post I have held for the past 32 years in every election to date, I do not feel that it is necessary to enlarge on my record. All I can say is that this Union of ours—yours and mine—has been my life, that I have given the best years of my life to it, that I have received my reward in the satisfaction of accomplishments in behalf of my liquor salesmen and that I look forward to serving them in the future as I have had in the past.

\*    \*    \*    \*    \*    \*

Whatever differences I may have with my opponents, I am sure that even they will agree with me that between our respective slates there are two varying views of trade unionism.

There is a view which I and those associated with me hold—the view that trade unionism is a challenge constantly renewed, beckoning us toward a destiny where the meaning of our lives matches the efforts we put forth to strengthen Local 2 as the instrument for the realization of the hopes and aspirations of its members. And then there is the view that trade unionism is irrelevant to the problems of the liquor salesmen—a view set forth in theory and practice by the two leaders on the opposition slate.

\* \* \* \* \* \*

My fellow members of Local 2: When you go to the polls, you will have to decide not only *who* will lead you for the period ahead but also *what* will lead you—what kind of philosophy and practise (sic). I would not want you to vote for me and my associates unless you cast your ballot in favor of a trade union approach to the problems of Local 2. If you don't want a Union, or if you want a Union that cannot stand up to your employers, you should vote accordingly. But if you want a Union, and a Union capable of facing up to the challenges of the 1970s just as it stood up to the challenges of the past three decades, your ballot should reflect that viewpoint.

\* \* \* \* \* \*

The choice, fellow members, is yours. This is a democratic Union, and the election will be supervised by the Honest Ballot Association. But it is important that you vote, for your ballot will shape the future of Local 2. I feel strongly that you owe your Union the obligation to exercise your right of the franchise. It is my hope that the election will give the Officers and Executive Board so elected a clear and unequivocal mandate.

\* \* \* \* \* \*

We in Local 2 are at the crossroads. There is one road that will lead, I feel, to defeat and the elimination of everything which has meant so much to Local 2 and its members as well as their families. There is the other road —a well-travelled road which has as its goal the strengthening of Local 2 and the betterment of its members and their families. On which road will you travel? The decision is in your hands when you enter the polling booth on Friday, January 9."

The January issue was also received by Union members prior to the election as was obviously intended.

Returning to the sequence of events, a few days before the January 9 election, there was testimony that the membership of the Union received notices through the mail that there would be a salesmen's meeting at 10:00 on the morning of the 9th at the offices of the Peerless Importers, Inc. The notice stated that employees were required to attend, although there was testimony that usually the roll was not called at such meetings. (Supervisors informally noted which of their men were absent). It was the usual practice of the employer to hold salesmen's meetings bi-monthly, on Fridays, when, it was testified, business generally lulls for the salesmen. On the morning in question, approximately 250 liquor salesmen were in attendance. The meeting was held in the morning, the employer testified, so that the Union members could vote. The balloting commenced at 2:00 P.M. The meeting lasted roughly an hour and a half.

According to the witnesses called by the Secretary, the agenda consisted of a presentation for approximately one hour by a supplier of liquors concerning his product. When he concluded his speech, Mr. Magliocco, the employer at whose business premises the meeting was held, made certain remarks which are challenged here. There was little variance in the accounts of what the employer said, among the witnesses on both sides. Those persons who testified for the Secretary stated that Mr. Magliocco said the following approximately:

"I'm not going to hold you here very long . . . You have a very important function to take care of to-

day . . . You have an election and you have to vote . . . I've been doing business with your union for 20 years . . . You know you might be better off with what you had than with what you are going to get."

(Tr. of Mar. 17, 1971, pp. 181–182).

Mr. Magliocco, when put on the stand by the defendant Union testified:

"When we opened up the meeting, I told them, of course, 'Good morning, gentlemen. Some of you are wondering why we have our meeting . . . in the morning rather than in the afternoon. I was told that there was going to be a union voting at 2 O'clock this afternoon. So in order to enable you to attend your meeting and enable you to go and vote, we decided to call the meeting early in the morning. I think you should go vote. Exercise your prerogative. You're a union member. Vote for whomever you want to vote, but you owe it to yourselves to go and vote. You owe it to your families. I'm old fashioned, and don't go by the adage that I believe in. You feel free to vote however you want to vote. The adage I believe in is, I know what I've got but I don't know what I will get. But nevertheless, God bless you and go and vote for whomever you want to vote.' "

(Tr. at 499–500).

Mr. Magliocco also testified that several sales managers and distributors spoke at the January 9 meeting. The employer testified that he spoke to the men about parking facilities, a new computer system that the business had installed and other things, as well, in addition to saying what is reproduced above. The other witnesses called by defendant gave testimony which corroborated that offered by Mr. Magliocco relative to what he said at the meeting.

■ Defendant is a labor organization engaged in an industry affecting commerce within the meaning of 29 U.S.C. § 402(i) and (j). Its elections are, therefore, subject to the provisions of § 481, et seq. (Title IV of the Labor Management Reporting and Disclosure Act of 1959, LMRDA). Suits of this type are clearly cognizable by a federal district court. 29 U.S.C. § 482(b).

Defendant claims, however, that the statutory prerequisite to bringing suit, i. e., exhaustion of union remedies by the complainants, was not complied with and that, therefore, this court lacks jurisdiction of the instant action.

Addressing attention to this contention, we begin by noting that Congress, in passing the LMRDA was careful to protect what it felt to be the public interest in allowing unions wide latitude in the conduct of their own internal controversies. . . . Calhoon v. Harvey, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). To that end, Congress provided for exhaustion of intra-union remedies before sanctioning governmental intervention to remedy any alleged violations of law. 29 U.S.C. § 482(a). Consequently, any disaffected union member must first give union machinery a chance to remedy a perceived wrong before resorting to the filing of a complaint with the Secretary of Labor requesting an investigation.

A complaint may be filed with the Secretary by a member of a union complaining of the conduct of an election as violative of Title 29 U.S.C. § 481(g) within one calendar month after one of two occurrences: 1) after the complaining member "has exhausted the remedies available under the constitution and by-laws of such organization and of any parent body", or, 2) after the complainant has invoked such available remedies without obtaining a final decision within three calendar months of their invocation. 29 U.S.C. § 482(a).

The January 9, 1970 election was held at the Holiday Inn, in New York City from 2:00 to 6:00 P.M. The election was subject to the Constitution and Work Rules of Local 2, as well as the Constitution of the Distillery, Rectifying, Wine and Allied Workers' International Union of America. (AFL–CIO)

The Honest Ballot Association supervised the election and certified the following outcome on the basis of the 1152 valid votes found cast:

PRESIDENT

| | |
|---|---|
| MORT BRANDENBURG | 611 ** |
| ALFRED CAPOLINO | 534 |

EXECUTIVE VICE PRESIDENT

| | |
|---|---|
| JOSEPH MATRANGA | 598 ** |
| JOHN SHERIDAN | 543 |

EXECUTIVE SECRETARY

| | |
|---|---|
| IRVING LIPMAN | 612 ** |
| LOUIS GUTIN | 526 |

2d VICE PRESIDENT

| | |
|---|---|
| RAYMOND MONAHAN | 600 ** |
| MICKEY SABATINO | 530 |

TREASURER

| | |
|---|---|
| HOWARD GOLDSTEIN | 588 ** |
| WILLIAM D. LEE | 543 |

FINANCIAL AND RECORDING SECRETARY

| | |
|---|---|
| NORMAN JOSEPH | 562 ** |
| MICHAEL PUMA | 556 |

EXECUTIVE BOARD (5)

| | |
|---|---|
| VINCENT CUNNINGHAM | 541 ** |
| HARRY MEYERS | 502 ** |
| ROCCO PAPE | 491 ** |
| ROLAND CRISPINIO | 497 ** |
| KENNETH LEBOWITZ | 496 ** |
| JOHN DUNCAN | 482 |
| PHILIP KNECHT | 479 |
| BERNARD FITZSIMONS | 476 |
| MORTIMER BERMAN | 456 |
| JACK SWARTZBERG | 445 |
| IRVING EHRENBERG | 305 |

In all instances the incumbents were reelected.

On January 10, 1970 (within 24 hours after the election), the complaining Union members, all of whom were unsuccessful candidates, addressed an election complaint by Western Union Night Letter to the Recording Secretary of Local 2, Norman Joseph, and to George Oneto, General Secretary-Treasurer of the International.

A hearing on the election complaint was held on January 16, 1970, by the Executive Board of the Union. At that time, the complainants were given an opportunity to testify and to offer evidence in support of their complaints. They complained of the articles in the December 1969 and January 1970 issues of the *Journal* and of the remarks of Mr. Magliocco at the salesmen's meeting.

On February 2, 1970, since no action on their complaints had been communicated to them from the Executive Board, the complainants wrote to the International Secretary-Treasurer again. This time they complained of the Union's failure to act promptly on their complaints as required by the International's Constitution. Eight days later (February 10, 1970), the International's General Secretary-Treasurer wrote to Local 2 reminding it of its duty to act promptly on election complaints. Thereafter, the Union sent letters to the complainants advising them that the transcript of the January 16 hearing had just been received and that the Executive Board would proceed to adjudicate the complaints registered.

By March 2, 1970, there still had been no decision from the Executive Board. By letter dated March 2, 1970, complainants again protested to the International's General Secretary-Treasurer about the delay of the Executive Board in adjudicating their claims.

It was not until March 13, 1970, sixty-two days after the initial protest letter was communicated to the Union, that the complainants were advised by President Brandenburg that the Board had determined that the allegations were to be overruled and dismissed on the ground that "there was no proof produced to support said allegations."

On March 16, 1970, complainant Sheridan dispatched a letter of appeal to the International's General Secretary-Treasurer and to the Recording Secretary of the Union. The day after that, on March 17, 1970, complainants' counsel, Godfrey Schmidt, mailed the International a letter setting forth in further detail the substance of the complaints.

According to testimony adduced by defendants on trial, neither of these letters reached the headquarters of the International in Englewood, New Jersey until

** Incumbent

March 30, 1970. The envelopes which might have borne a stamped date of mailing were not produced. Defendant claimed the envelopes were lost or destroyed.

The long delay was apparently occasioned by the now historic Postal Workers' Strike which began on March 18, 1970, and concluded on March 25, 1970. This court has judicially noticed the fact of the strike, and that it effected a "critical work stoppage" affecting mail deliveries in the metropolitan area. Thus, it is more likely than not that letters mailed on the 16th and 17th of March, 1970, respectively, in New York City would not have reached their New Jersey destination a day or two later and probably would not have been delivered for several days after mailing.

On April 13, two days prior to the announcement of decision by the General Secretary-Treasurer of the International, five of the complainants filed an election complaint with the Secretary of Labor.

In a letter dated April 15, 1970, the General Secretary-Treasurer of the International notified the complainants that their letters were not received until March 30, 1970, and were, therefore, untimely. The General Secretary-Treasurer wrote:

> "The responsibility to make a timely appeal rests with the appealing members. Unless a timely appeal is filed there is no jurisdiction of the appeal and such untimeliness frustrates the application of complete intra-union remedies constitutionally provided for. Furthermore, notwithstanding any mail interruption during part of the period in question, which may have delayed the timely receipt of the appeal by such General Secretary-Treasurer, the appealing members' responsibility was to assure a timely filing. Such timely filing could have been accomplished conveniently by telegram or personal delivery and particularly where it was the widest of public knowledge that delivery of mails was being delayed by reason of postal employees remaining away from their positions."

Defendant argues that this court is without jurisdiction of this action because under the foregoing facts complainants failed to timely exhaust the remedies available under the constitution and bylaws of Local 2 and its parent International before filing their complaint with the Secretary. The essence of Local 2's contention is that since the letters of March 16th and 17th did not reach the office of the International until March 30th, a date well in excess of the five days provided for appeal by the International's constitution, intra-Union remedies were not exhausted as is required by the Act.

The Government, on the other hand, argues that Union remedies were duly exhausted by complainants, and that complainants did timely file their appeal with the International before filing their complaint with the Secretary.

The International constitution provides that upon taking an appeal, the complaining member or candidate shall submit his complaint to the Recording Secretary of the Local Union within forty-eight hours after the election results have been announced, with a copy to the General Secretary-Treasurer. (Article X, Section 2). The Constitution then commands that the complaint shall be heard and determined "promptly" by the Local Executive Board (*Id.*). An appeal may be taken to the International from the decision of the Local Executive Board or its failure to act. (*Id.*) The appeal must be taken within five days of the decision or failure to act. (*Id.*). How a complainant is to determine when there has been a failure to act so that he might take a timely appeal is not at all clear.

In any event, this court holds that complainants timely invoked these intra-Union remedies and ninety days later (April 13, 1970) when there was still no final decision, they had the right to lodge their complaint with the Secre-

tary. 29 U.S.C. § 482(a). This court, therefore, has properly assumed jurisdiction. Shultz v. Local 1291, International Longshoreman's Ass'n, 429 F.2d 592 (3rd Cir. 1970); Wirtz v. American Guild of Variety Artists, 267 F.Supp. 527 (S.D.N.Y.1967); *cf.* Giordani v. Upholsterers International Union of North America, 403 F.2d 85 (2d Cir. 1968). If the Union's Executive Board had acted "promptly" upon the appeal taken within forty eight hours of the election, there obviously would be no question now as to whether the complainants had given the Union an opportunity to remedy their complaints before resorting to the Secretary. It was the Executive Board's failure to act for more than 60 days which frustrated the attempt by complainants to first exhaust their intra-Union remedies before filing a complaint with the Secretary. As the Court ruled in the *Shultz Case, supra,* 429 F.2d at 597: "It [the Union] cannot rely upon . . . its own delay in deciding various stages of appeal to destroy the right of a member to resort to the Secretary of Labor under the alternative provision of subsection (2). [§ 482(a) (2)]."

The manifest purpose of § 482(a) (1) and (2) is "to postpone governmental intervention until the Union is afforded the opportunity to redress the violation." Wirtz v. Local 153, Glass Bottle Blowers Ass'n, etc., 389 U.S. 463, 472, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968). "At the same time, however, unions were expected to provide responsible and responsive procedures for investigating and redressing members' election grievances." Wirtz v. Local Union No. 125, 389 U.S. 477, 484, 88 S.Ct. 642 (1968). The Union's failure to provide such responsive procedures here is plain.

■ The court finds that the articles contained in the December 1969 and the January 1970 issues of the *Journal,* excerpted above, were statements designed to promote the candidacy of the incumbent Union president and the other incumbents.

A line must, obviously, be drawn, as the court said in Yablonski v. United Mine Workers of America, 305 F.Supp. 868, 871 (D.C. Cir. 1969), between the use of the Journal to report the activities of Brandenburg as president of the Union, which is permissible, and the use of the Journal, in such a way in reporting such activities, as to promote the candidacy of the president. This court finds, as the court found in *Yablonski,* that this line has been breached here and that the December 1969 and the January 1970 issues of the Journal were used to promote the candidacy of Brandenburg and the other incumbents. The excerpts above show that the JSC was severely criticized in the issues in question for its legal and other activities, condemned as anti-Union, and characterized as immoral and self-seeking. On the other hand, Brandenburg expansively praised his own record, characterized himself as pro-Union, and declared that he and not JSC, was seeking to promote the interests of the Union and its members. "The fact is that, in the context of a bitterly contested election, the contents and emphasis of a union periodical such as the Journal must be judged in the light of the Landrum-Griffin Act." *Yablonski, supra* at 871. The "tone and content" of the articles in the Journal which are challenged were to endorse and encourage the reelection of Brandenburg and the other incumbents. Wirtz v. Independent Workers Union of Florida, 272 F.Supp. 31, 33 (M.D.Fla.1967).

This court agrees that,

"The obvious purport of § 401(g) of the Act is to prohibit a labor organization from showing a preference for any one candidate and to prevent candidates from depleting union treasuries through election campaigns. It was aimed at all candidates but especially towards incumbents who, once in office, might abuse their trust to become more entrenched. The section reflects the principle of union democracy that individual members are free to support persons of their own choosing in an election and cannot be forced

directly or indirectly by dues diversion to lend support to others whom they oppose." Retail Clerks Union, Local 648 v. Retail Clerks International Ass'n, 299 F.Supp. 1012, 1023 (D.D.C. 1969).

The Union expended more than $2,000.-00 to print the two issues of the *Journal* at issue. The amount of money spent, however, is not the test of whether there has been a violation of § 481(g). The statute provides that, "No moneys received by any labor organization by way of dues, assessments, or similar levy * * * shall be contributed or applied to promote the candidacy of any person * * *." Shultz v. Local Union 6799, United Steel Workers of America, 426 F.2d 969 (9th Cir. 1970). "The legislative history of the Act does not indicate that Congress intended to place a limit on the amount that a union might lawfully spend to aid a candidate for office or that it meant to encourage troublesome factual disputes over how much (or little) money constitutes a 'de minimis' amount; and the language of the provision itself is clear and unambiguous." *Shultz, supra,* at 972. As the court ruled in Retail Clerks Local 648, *supra,* 299 F. Supp. at 1024, "The prohibitions of § 401(g) refer to direct contributions from union treasuries to candidates for, as examples, the printing and distribution of campaign literature, the renting of campaign offices, and the paying of campaign personnel." And, as the court recognized in the several *Yablonski Cases,* 305 F.Supp. 868 (D.D.C.1969), 61 L.C. § 10, 477 (D.D.C.1969); 307 F.Supp. 1226 (D.D.C.1969), and 61 L.C. § 10, 500 (D. D.C.1969), the statute is also aimed at improper use of the Union's *Journal* which is a wholly Union financed publication. This court, therefore, holds that the Secretary has established, by a preponderance of the evidence, that § 481 (g) was violated by the Union in the conduct of the election. 29 U.S.C. § 482(c). The evidence disclosed that the challenged issue of the Journal reached the members prior to the January 9, 1970 election. The court therefore, reaches the question whether there is a reasonable probability that the violation of § 481(g), which it has found, may have affected the outcome of the election. 29 U.S.C. § 482(c); Wirtz v. Hotel Employees Union, 391 U.S. 492, 507, 88 S. Ct. 1743, 20 L.Ed.2d 763 (1968); Wirtz v. Local Union 410, etc., 366 F.2d 438, 443 (2d Cir. 1966).

As the election tally reveals, the margin of victory for the incumbents was narrow in most instances, *e. g.,* the incumbent president won by 77 votes; the executive vice president won by 55 votes; the executive secretary won by 86 votes; the 2d vice president won by 70 votes; the treasurer won by 45 votes; and the financial and recording secretary won by only 6 votes.

In cases such as this, "there can be no tangible evidence available" of the effect of the violation. Wirtz v. Local Union 410, *supra,* at 443. Shultz v. Local Union 6799, *supra,* 426 F.2d at 972–973. The court finds that there is "a reasonable probability" that the violation may have affected the outcome of the election.

The court finds that the Secretary has not established the second claimed violation of 29 U.S.C. § 481(g), *i. e.,* that the employer contributed money to promote the candidacy of certain Union candidates when he made the statements reproduced above at the salesmen's meeting on the morning of election day. The court so concludes on the basis of the facts detailed below.

First, the testimony did not establish that the meeting had been specially called for the purpose of promoting anyone's candidacy. As a matter of fact, the evidence established that such salesmen's meetings are regularly called at least twice monthly on Fridays. No special place was hired to host the gathering. The meeting was held on the usual business premises of the owner. The agenda was roughly that which was customary. The employer spoke about current problems and industry activities. A sales representative from one of the liquor houses spoke for the bulk of the time

about his products. In other words, it was a regular salesman's meeting of which the statements challenged here comprised a very small part.

Secondly, the proof established, at most, that the employer thoughtlessly and inartfully tossed off a remark to the effect that, "You know you might be better off with what you had than with what you are going to get." This ambiguous thought could mean that the employer expected the incumbents to be ousted. The Secretary's witnesses could offer no proof of an intent to influence the election other than this brief remark made at the end of the meeting in a singularly off-hand, spur of the moment, fashion.

Thirdly, it was not established upon the trial that any employer money was directly contributed to promote the candidacy of any person. The claim is that the employer indirectly contributed by sponsoring a meeting for this purpose. The salesmen work on a commission basis rather than as salaried employees. The Secretary argues that employer money was expended because if the employees had been free at the time the meeting was held, they might have done more business, taken orders, and increased the employer's revenues. Since they were at the meeting at the time, they could not have made the sales, and hence employer funds were expended.

But this is too speculative a basis for finding that an employer contributed money to promote candidacies in violation of § 481(g). As in the case of the expenditure of Union funds, there must be proof of contributions of money to directly promote the candidacy of particular persons. Retail Clerks Union, Local 648 v. Retail Clerks International Ass'n, *supra*, 299 F.Supp. at 1024. Here the employer's contribution was merely incidental to proper employer expenditures. The Secretary thus has not sustained his burden of showing a violation of § 481(g) by a preponderance of the evidence.[1]

Defendant contends that § 481(g), under the guise of controlling expenditures during union elections, violates the First Amendment, is too vague and too broad, and is unconstitutional on its face and as applied. (Defendant's Pretrial Memorandum, p. 6).

In this connection, defendant claims that union newspapers are protected organs of expression within the meaning of the First Amendment and, as such, all the statements contained in the December 1969 and January 1970 issues of the *Journal* are similarly protected.

This court has found that the challenged statements, in the context of this case, promoted the candidacy of the incumbents, particularly the incumbent president Mortimer Brandenburg.

This court now holds that contrary to defendant's assertion, the statutory prohibition against use of union funds to promote the candidacy of any person does not unconstitutionally infringe upon First Amendment freedoms. *see* United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966).

The statute requires only that a would-be-electioneer not use union or employer funds to promote the candidacy of any person participating in an election subject to the provisions of Title IV of the LMRDA.

Union funds may be used as the statute provides "for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election." 29 U.S.C. § 481 (g).

---

1. The court having found that the Secretary failed to carry his burden of proving direct contributions by the employer, it is unnecessary to discuss defendant's other contentions relating to the claimed violation of § 481(g) by the activities of the employer's *i. e.,* whether the employer is an indispensable party to the action and whether proof of solicitation of the employers contribution is essential.

The obvious purport of the statute has already been cited above. Retail Clerks Union, Local 648 v. Retail Clerks International Ass'n, *supra*, 299 F.Supp. at 1023.

Congress in enacting § 481(g) did not dispute the right of union members, including union officials, to exercise First Amendment rights. As a matter of fact, Congress, at the same time, sought not only to protect but to expand the First Amendment rights of union members. 29 U.S.C. §§ 401, 411.

This statute is aimed wholly and solely at non-speech activity, although it is obviously entwined with free speech activity.

The United States Supreme Court has held that when speech and non-speech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the non-speech element can justify incidental limitations on First Amendment freedoms. United States v. O'Brien, *supra*.

The Supreme Court has also explicated the type of governmental interest which may justify such an incidental infringement of free speech, all of which the court finds applicable here. United States v. O'Brien, *supra*, 391 U.S. at p. 377, 88 S.Ct. at p. 1685:

"[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

The statute in question was passed by the Congress pursuant to its unquestioned power to regulate interstate commerce. 29 U.S.C. § 401(a). The major interests which the LMRDA seeks to further are explicitly set forth by the Congress. 29 U.S.C. § 401(c). Among these is the prevention of improper practices on the part of labor organizations which distort and defeat the policies of other federal labor legislation and which have a tendency to affect commerce between the states. And among the improper practices found by the Congress after investigation were "a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct." 29 U.S.C. § 401(b). Wirtz v. Local 153, Glass Bottle Blowers Ass'n, *supra*, 389 U.S. at 470, 88 S.Ct. 643. The governmental interests as expressed above are manifestly unrelated to the suppression of free speech. "Title IV's special function in furthering the overall goals of the LMRDA is to insure 'free and democratic' elections." (*Id.* at 470, 88 S.Ct. at 648). And, as set forth above, Congress, at the same time, enacted provisions to protect and extend free speech. 29 U.S.C. § 411(a) (2). The incidental restriction on speech here is no greater than is essential to the furtherance of the governmental interests enunciated above. The only thing which is proscribed is the use of union or employer funds to promote the candidacy of any person in an election subject to the provisions of Title IV of the LMRDA. Employers were included because, as the hearings before the Congress disclosed, "They (some employers) have cooperated with and even aided crooks and racketeers in the labor movement at the expense of their own employees. . ." Senate Report No. 187 on S. 1555 (86 Cong. 1st Sess.1959) U.S.Cong. & Admin. News, p. 2322.

The statute is, therefore, not too vague and too broad as alleged. *Cf.* Adderley v. Florida, *supra*. This is a precise and narrowly drawn regulatory statute evincing a legislative judgment that certain specific conduct be limited or proscribed. *Cf.* Adderley v. Florida, *supra*, 385 U.S. at p. 42, 87 S.Ct. at p. 244. "There is no lack of notice in this law, nothing to entrap or fool the unwary." *Id.*

The statute is neither unconstitutional on its face nor as applied to the facts of this case. The facts of this case make

it abundantly clear that we are here dealing with the precise evil with which the Congress intended to deal. One who runs for office does what he legitimately can to promote his own candidacy. The quintessence of such an aim is to criticize one's opponent and the activities of one's opponent. That is precisely what was done here by the challenged articles appearing in the Union's *Journal*. This action, however, is unlawful only because the *Journal* is a Union financed publication. *Cf.* Gulickson v. Forest, 290 F. Supp. 457, 464 (D.C.N.Y.1968). The statute provides that, "No moneys received by any labor organization . . . shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions" of the LMRDA. Here the challenged election is subject to the LMRDA.

▪ Defendant argues that the statements contained in the December, 1969, and January, 1970, issues of the *Journal* were reports on matters of great interest and concern to the membership, and were, therefore, required and protected by 29 U.S.C. § 501(a).[2]

This court does not agree. The articles at issue here are not the type of *factual* accounting for financial activities of incumbents which the LMRDA seeks to exempt from the prohibition of 29 U.S.C. § 481 and to encourage under § 501(a). Rather, these articles were distinctly biased in favor of the incumbents. They sought to praise the incumbents and discredit the opposition in the then-coming

election. The facts regarding the pending lawsuits were not reported in a purely factual, unbiased manner. Review of pertinent cases provides support for the conclusion of the court that such articles are within Section 481(g)'s proscription. Yablonski v. United Mine Workers, *supra*; Wirtz v. Independent Workers Union of Florida, *supra*.

▪ Defendant's next claim, that complainants have unclean hands and cannot be allowed to bring this complaint, is likewise without merit. First of all, it is the Secretary who has instituted this complaint, not the original dissidents. The Secretary has made his own independent investigation of the circumstances surrounding the election. Even if the dissidents had unclean hands, that would not preclude the Secretary from pursuing the matter. The Secretary's duty is to vindicate the public interest in free and democratic elections. Wirtz v. Local 153, Glass Bottle Blowers Ass'n, *supra*. The Union has not demonstrated by any probative evidence that the original complainants acted in bad faith in questioning the election. The fact that one of the lawsuits instituted by JSC prior to the election has recently been found to be without legal merit has no relevance to the Secretary's action. Moreover, the *Journal* articles speak for themselves.

The election is voided by the first violation. The court will order, pursuant to 29 U.S.C. § 482(c), that a new election be held under the Secretary's supervision as soon as is feasible.

2. Section 501(a) provides:
   "The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and by-laws and any resolutions of the govern-

ing bodies adopted thereunder, to refrain from dealing with such organization as an adverse party or in behalf of an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. . . ."