**Ann McLAUGHLIN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**AMERICAN FEDERATION OF MUSI-CIANS OF the UNITED STATES AND CANADA, AFL–CIO, Defendant.**

No. 88 Civ. 1540 (RJW).

United States District Court, S.D. New York.

Nov. 23, 1988.

---

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for plaintiff; Allan N. Taffet, of counsel.

Bredhoff & Kaiser, Washington, D.C., George H. Cohen, Michael H. Gottesman, Patricia Polach, of counsel; Vladeck, Waldman, Elias & Engelhard, P.C., New York City, Sheldon Engelhard, of counsel; Henry Kaiser, General Counsel, American Federation of Musicians, Washington, D.C., for defendant.

ROBERT J. WARD, District Judge.

The Secretary of Labor, United States Department of Labor, (the "Secretary") filed this action to set aside the June 17, 1987 union election conducted by the American Federation of Musicians of the United States and Canada, AFL–CIO ("AFM"), pursuant to section 402 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 482. The Secretary requests that the court order a new election, subject to her supervision. Both parties have moved for summary judgment.

The crux of the complaint is that union moneys and assets were used to promote the candidacy of J. Martin Emerson ("Emerson") for President of AFM, in violation of section 401(g) of the LMRDA, 29 U.S.C. § 481(g). Specifically, the government challenges a number of articles which were published in the official newspapers of certain local unions of AFM in the months preceding the election. These articles were either critical of incumbent AFM President Victor Fuentealba ("Fuentealba") or supportive of the challenger for that office, Emerson. The Secretary also argues that the use of the logo of AFM and the logo of Local 802 on campaign letters written by a local union official in the months preceding the election violated section 401(g).

Defendant maintains that all but one of the challenged articles were permissible since they reported on newsworthy events concerning the union. One article is conceded to be a violation, but defendant argues that the violation was de minimis, and in no way affected the outcome of the election. Defendant also claims that the

use of union logos on the campaign letters did not amount to the use of union moneys in violation of section 401(g). Finally, defendant seeks summary judgment on the claim which alleges that employer moneys were contributed to promote Emerson's candidacy in violation of section 401(g). That claim is not part of the Secretary's motion for summary judgment. For the reasons that follow, the Secretary's motion for summary judgment is granted and defendant's motion for summary judgment is denied.

## BACKGROUND

The AFM is an international labor organization composed of approximately 465 chartered local labor organizations with approximately 200,000 members throughout the United States and Canada.

From November 1986 through January 1987, collective bargaining took place between AFM and the phonograph record manufacturers (the "manufacturers"). Fuentealba, as President of AFM, entered into a tentative agreement with the manufacturers which, among other things, avoided a strike by the union, but also reduced the amount of money the manufacturers were to contribute to certain Funds which benefited union members. The tentative agreement was fiercely opposed by officers of some of the local unions and an Advisory Committee to President Fuentealba. This disagreement was evident in a number of union newspapers published during the winter of 1987. Certain local union newspapers urged the membership to reject the tentative agreement with the manufacturers, while President Fuentealba urged its acceptance in the AFM national newspaper, the "International Musician". These articles are not challenged by the Secretary. Despite the opposition, in March 1987, the agreement was approved by a vote of 1153–844 in a membership ratification referendum.

The aforementioned negotiations apparently resulted in a rift between President Fuentealba and the leaders of certain local unions over the structure of the decision making process in AFM. In March 1987,

Local 802 and Local 47 co-sponsored proposed amendments to the AFM Bylaws. Certain of these amendments sought to alter the ratification process for collective bargaining agreements and make the American Arbitration Association responsible for conducting and certifying the election of AFM officers at the national convention election. The amendments, to be voted on at the June election, were opposed by Fuentealba. In April, the President of Local 47, Bernie Fleischer, as well as the President of another local union, were removed by Fuentealba from their positions on national union committees. Several of the articles challenged by the Secretary refer, at least in part, to these occurrences.

Also in March 1987, John Glasel, President of Local 802, New York, Bernie Fleischer, President of Local 47, Los Angeles, and Charles Guse, President of Local 10–208, Chicago, began a series of discussions that led to the formation of "Locals All for Marty". That organization was created on or about May 1, 1987 to support the possible candidacy of Emerson at the June election. Charles Guse, the designated treasurer of Locals All For Marty, set up a bank account for the organization and solicited funds from individual union members to be used to promote Emerson's candidacy.

### 1. The Newspaper Articles

The Secretary has challenged articles published in the three local union newspapers of those local union officials who formed Locals All For Marty. The individual newspapers were the "Allegro", official publication of AFM Local 802 (Glasel President), the "Overture," official publication of AFM Local 47 (Fleischer President) and the "Intermezzo", official publication of AFM Local 10–208 (Guse President). The cost of each of these publications is borne by the individual local union. Each publication is mailed to the members of that particular local union, as well as to the offices of other local unions of AFM. The newspapers were apparently not distributed at the Convention, nor were they sent directly to the delegates. The delegates, however,

were mostly local union officials who had ready access to local union offices.

The Secretary has cited five (5) different newspaper editions and seven (7) different articles as violating section 401(g). Summaries of the articles, the newspapers in which they appeared and samples of the passages which criticized Fuentealba or praised Emerson, are listed below:

a. *Allegro*

1. May 1987: *"AFM Prez Plays Politics"*

Fuentealba was criticized over his removal of local union officials from national union committees. The article began by stating: "[AFM] President Victor Fuentealba used the power of his office for political purposes in early April when he sent letters to the presidents of two large locals rescinding their earlier appointments to convention committees...." The article ends by reminding the reader that "AFM's convention is scheduled for June 15–18 at the Tropicana Hotel in Las Vegas, Nevada."

2. June 1987: *"AFM Prexy Raps 802 —Plays Politics at Conference"*

Fuentealba was criticized over his opposition to election reform and the comments he made in reference to Local 802 and Glasel at a union function. The article contains the subtitles "Fights Election Reform" and "Fosters Division". It also offers a prediction about Fuentealba's actions in the upcoming election.

b. *Overture*

1. April 1987: *"Fuentealba Criticized for Ignoring Locals—Members Call for New Limits on AFM Prexy"*

Fuentealba was criticized over his handling of the AFM and his opposition to the proposed Bylaw amendments. The article contains quotes from union members including:

"In professional negotiations, there is give and take. There's no give and take with Victor Fuentealba. He just gives",

and

"Fuentealba remains in power because of current legislative clamps. He's the law that giveth and taketh away."

2. April 1987: *"Toward a More Democratic Union"*

This column, written by Fleischer, talks about the phonograph record negotiations and the proposed Bylaw amendments and refers to the article in the April 1987 Overture cited above.)

3. May 1987: *"Fuentealba Removes Fleischer From Convention Committee as Big Locals Increase Pressure to Reform AFM"*

The letter written by Fuentealba notifying Fleischer that he was removed from his position on a national union committee and Fleischer's letter in response, criticizing Fuentealba, are reproduced in this article.

4. May 1987: *"AFM Reform Essential With or Without Vic"*

Fleischer's column criticizes Fuentealba over his opposition to the proposed AFM reform. In it, Fleischer states that:

"Those of us who insist on reform had hoped to achieve it without major personnel changes at the top. But, if that's what it takes, it won't be the first time that elected officials were turned out in a losing defense of bad policy."

c. *Intermezzo*

1. June 1987, *"A Message From Pres. Charles A Guse—Fuentealba v. Emerson"*

This column, written by Guse, advocates Emerson for President of AFM and criticizes Fuentealba. In this article Guse wrote:

"The drafting of Marty Emerson as a presidential candidate has instilled an air of hopeful optimism among all who know and love this man. He has dedicated his life to improving the future of ALL musicians. Clearly, the A.F.M. has reached a crossroads and this convention will be the turning point of ALL musicians."

### 2. The letters

The Secretary also challenges three letters written by Local 802 President John Glasel on stationary containing either the AFM union logo or the Local 802 union logo. The letters were distributed directly to the delegates at the June election. In these letters, Glasel criticized Fuentealba, put forth his own views on certain union issues, and endorsed the candidacy of Emerson. The letters were dated:

 a. May 27, 1987 (AFM union logo)

 b. June 2, 1987 (AFM union logo),

 c. June 14, 1987 (Local 802 union logo)

### 3. The Convention Election

The AFM Bylaws provide for a National Convention Election (the "Convention"). Each local union has from one to ten votes at the Convention, depending upon the size of its membership. The votes for the office of President of AFM are cast in a secret ballot by delegates selected from the local unions. The size of the local union also determines the number of delegates each local union may send to the Convention and therefore, the number of votes held by each individual delegate. No more than four delegates can vote at the Convention from any one local union.

The 1987 Convention was held in Las Vegas during June 1987. The nominations for office occurred on June 16, 1987 and the balloting was held the next day. During the Convention, the two candidates for President of AFM solicited votes from the uncommitted delegates. In addition, the Committee to Reelect President Victor Fuentealba and Locals All For Marty were both at work distributing legitimate campaign literature for their respective candidates throughout the Convention.

On June 17, 1987, the 693 delegates to the Convention elected Emerson as President by a margin of 708 to 650 (58 votes) over the incumbent, Fuentealba. Fuentealba filed a complaint with the Secretary on August 7, 1987 which resulted in an investigation of the election and the filing of this complaint by the Secretary on March 7, 1988.

## DISCUSSION

A court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2nd Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co., supra*, 804 F.2d at 12. The motion then

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed Rule Civ Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

■ As noted above, the parties in the instant case have each moved for summary judgment. Cross-motions for summary judgment, however, do not warrant the granting of summary judgment unless the Court finds that "one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Frouge Corp. v. Chase Manhattan Bank*, 426 F.Supp. 794, 796 (S.D.N.Y. 1976). *See also Bank of Am. Nat'l Trust and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 716 (2d Cir.1985); *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 313–14 (2d Cir.1981); *Home Ins. Co. v. Aetna Casualty and Surety Co.*, 528 F.2d 1388, 1390 (2d Cir.1976).

■ When material facts of the case are not in dispute, summary judgment is appropriate on the questions of whether a violation of section 401(g) occurred and whether any such violation may have affected the outcome of the election. *See Donovan v. National Alliance of Postal & Federal Employees*, 566 F.Supp. 529, 533 (D.D.C. 1983); *Donovan v. Local 719, United Auto., Aerospace and Agricultural Implement Workers of America*, 561 F.Supp. 54, 60 (N.D.Ill.1982); *Usery v. International Organization of Masters, Mates and Pilots*, 422 F.Supp. 1221, 1229–30 (S.D.N.Y.), *aff'd*, 538 F.2d 946 (2d Cir.1971).

This case is unique because the Secretary alleges union moneys were used to promote the candidacy of the *challenger* for union office and to attack the incumbent union official. Typically, the incumbent candidate has a monopoly on access to union moneys and can use them to obtain an unfair advantage over a challenger. All the prior cases dealing with section 401(g) which have been presented to the Court have addressed situations where the incumbent was the one accused of violating the statute.

The applicable legal standard set forth in section 401(g) provides that:

No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this title. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

Once a violation of section 401(g) has occurred, then if the court finds

that the violation ... may have affected the outcome of the election, the court shall declare the election, if any, to be void, and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization.

Section 402(c)(2) of the LMRDA, 29 U.S.C. § 482(c)(2).

■ The purpose of Title IV of the LMRDA was to insure "free and democratic elections", *Wirtz v. Local 153, Glass Bottle Blowers Association*, 389 U.S. 463, 470–71, 88 S.Ct. 643, 648, 19 L.Ed.2d 705 (1968), and encourage union democracy. *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 498, 88 S.Ct. 1743, 1747, 20 L.Ed.2d 763 (1968). The LMRDA was expressly designed "to prevent, discourage, and make unprofitable, improper conduct on the part of union officials, employers and their representatives." S.Rep. No. 187, 86th Cong., 1st Sess., *reprinted in* (1959) U.S.Code Cong. & Admin. News, 2318, 2321.

## A. THE NEWSPAPER ARTICLES

■ In applying section 401(g) to the articles challenged here, the critical issue is whether the articles went beyond the scope of legitimate coverage of newsworthy activities and into the realm of violative union-financed campaign literature. Such a determination necessarily revolves around the specific words printed, as well as the context in which the articles appeared. The Court must look to the "tone, content and timing of the defendant's publications" in order to ascertain whether these publications constitute promotion of a candidate in

violation of section 401(g). *Donovan v. National Alliance of Postal & Federal Employees, supra,* at 532 (D.D.C.1983) (articles in union journal praising incumbent violated section 401(g)); *Donovan v. Local 719, United Auto., Aerospace and Agricultural Implement Workers of America, supra,* at 58 (N.D.Ill.1982) (tone, timing, and content of union leaflet which attacked opposition candidates violated LMRDA).

A Department of Labor Interpretive Regulation, cited approvingly by Courts, is specifically addressed to biased union-financed publications which are distributed during a pending union election. It states:

> The provisions of section 401(g) prohibit any showing of preference by a labor organization or its officers which is advanced through the use of union funds to criticize or praise any candidate. Thus, a union may neither attack a candidate in a union-financed publication nor urge the nomination or election of a candidate in a union financed letter to the members. Any such expenditure, regardless of the amount, constitutes a violation of section 401(g).

29 C.F.R. § 452.75 (1987). *See Donovan v. National Alliance of Postal and Federal Employees, supra,* 566 F.Supp. at 532; *Donovan v. Local 719, United Auto., Aerospace and Agricultural Implement Workers of America, supra,* 561 F.Supp. at 57.

### 1. The articles in the Allegro and the Overture

The Secretary argues that section 401(g) provides for a strict ban on union-financed electioneering. The challenged newspaper articles in the Allegro and the Overture, the Secretary asserts, violated the statute because they criticized Fuentealba in the months preceding the election. The criticism constitutes campaigning under section 401(g), notwithstanding otherwise legitimate newsworthy reporting in the articles, according to the Secretary.

Defendant contends that the articles in the Allegro and the Overture presented extensive and legitimate discussions on issues confronting the union. The voicing of diverse opinions regarding union issues is in harmony with the LMRDA's purpose of increasing union democracy. Therefore, defendant argues, the challenged articles which criticized the incumbent leader's activities were not only consistent with section 401(g), but also protected by the LMRDA. Because criticism of incumbent officials is protected, defendant continues, a challenger for union office can only violate section 401(g) by affirmatively promoting his own candidacy. Defendant asserts that the Department of Labor Interpretive Regulation cited above does not apply, or should not be deferred to, because criticism of an incumbent is in accordance with the purposes of the LMRDA. Finally, defendant maintains that applying section 401(g) to these articles might run afoul of the First Amendment.

■ Addressing the Constitutional issue first, section 401(g)'s application here does not violate the First Amendment. While section 401(g) impacts on speech activity, it is narrowly directed to serve important government interests and, as such, does not impermissible infringe on the First Amendment. *Hodgson v. Liquor Salesmen's Union, Local No. 2,* 334 F.Supp. 1369, 1379–81 (S.D.N.Y.), *aff'd,* 444 F.2d 1344 (2d Cir.1971) (articles in union journal praising incumbent and criticizing challenger violated section 401(g)). *See also, Marshall v. Local Union 20, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Commerce,* 611 F.2d 645, 652–53 (6th Cir.1979) (the important interests of the government in creating section 401(g) were unrelated to the suppression of speech and therefore section 401(g) is constitutional).

> Congress in enacting § 481(g) did not dispute the right of union members, including union officials, to exercise First Amendment rights. As a matter of fact, Congress, at the same time, sought not only to protect but to expand First Amendment rights of union members. 29 U.S.C. §§ 401, 411.... The incidental restriction on speech here is no greater than is essential to the furtherance of the governmental interests.... The only thing which is proscribed is the use

of union or employer funds to promote the candidacy of any person in an election subject to the provisions of Title IV of the LMRDA.

*Hodgson v. Liquor Salesmen's Union, Local No. 2, supra,* 334 F.Supp. at 1380.

 The LMRDA only comes into play in these circumstances when moneys which members may have contributed as a condition of union membership are used to subsidize a publication which promotes one candidate over another. Section 401(g) does not restrict the right of union members and officials to use their private resources to campaign themselves or to support another candidate in any way they see fit. *Cf. Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (restrictions on campaign contributions in political arena consistent with the First Amendment, but ceiling on expenditures for candidates invalid). Its application here is consistent with the First Amendment.

 There is also no support for defendant's argument that a different standard should be applied to violations of section 401(g) committed by a challenger for union office. The plain words of the statute state that union moneys cannot be used to promote the candidacy of "any person". Congress defined the word "person" under the LMRDA as including "one or more individuals". 29 U.S.C. § 402(d). No distinction was drawn between an incumbent and a challenger. In addition, Emerson, the challenger, was supported by three incumbent local union Presidents. Incumbent officials may not use their entrenched positions of leadership, through the vehicles of their local union newspapers, to promote their choice for union office.

Whoever receives the benefit of union moneys during an election is assisted to the detriment of other candidates and union members. An even-handed application of section 401(g) promotes fairness and democracy in union elections. When a challenger is in a position to use union moneys, he or she is subject to the LMRDA sections governing the use of union funds. Furthermore, common sense, as well as the Interpretive Regulation cited above, dictate

that the promotion of a candidate under section 401(g) includes both affirmative statements about the candidate and negative references about the opposition. Therefore, as the Secretary argues, no special exemption from section 401(g) exists for challengers for union offices.

 The foregoing determination and the fact that Fuentealba was criticized in the articles does not end the dispute in this case. The Court does not agree with the Secretary's restrictive view that only the words of the articles are to be considered in making a section 401(g) determination. In fact, in order to ascertain if the tone, timing and content of the articles makes them violative campaign literature, the Court must necessarily take into account the circumstances surrounding the challenged publications. *See Hodgson v. Liquor Salesmen's Union, Local No. 2, supra,* 334 F.Supp. at 1377.

Defendant has persuasively pointed out that increasing the diversity of views expressed to union members fulfills the LMRDA's overriding purpose to promote union democracy. This purpose is served especially well when policies at odds with those of current leadership are put forth. "The tight grasp of incumbent leaders should be recognized when a court interprets LMRDA union election requirements so that opposition voices can be heard and their weight felt." *Donovan v. CSEA Local Union 1000, (citation omitted),* 761 F.2d 870, 875 (2d Cir.1985) (vague and subjective criteria used in election nominating procedures violated the LMRDA). Furthermore, an objective of section 401 is "to keep union leadership responsive to the membership" and thereby promote democratic governance in the union. *Wirtz v. Hotel, Motel & Club Employees Union, Local 6, supra,* 391 U.S. at 497, 88 S.Ct. at 1747.

The articles in the Allegro and the Overture did provide a different viewpoint from that of the national union leadership. As the incumbent President, Fuentealba had a national newspaper in which he expressed his views regarding union policies and criticized those individuals who opposed his

views (and who were not running for union office). Fuentealba's status as a candidate for reelection should not result in a ban on debate over union issues in which he, as President, is involved. As defendant argues, some degree of critique may be necessary to have an informed debate on issues.

■■■ In addition, favorable news reporting regarding an incumbent, or critical news reporting regarding a challenger, in the months preceding an election does not necessarily violate section 401(g) because union members need to "have some latitude to speak freely about matters of current concern to members, although these may often be campaign issues as well...." *Donovan v. Metropolitan District Council of Carpenters*, 797 F.2d 140, 145 (3rd Cir.1986) (remarks critical of candidate in union minutes were not a violation of the LMRDA, but distribution of corrected remarks attacking the candidate was a violation). The Secretary acknowledges that objective news reporting is protected and encouraged under the LMRDA. *See e.g., Yablonski v. United Mine Workers of America*, 305 F.Supp. 876, 877 (1969).

Furthermore, in cases concerning section 401(c), which guarantees non-discriminatory access to union membership lists, it has been noted that newspaper coverage of an incumbent candidate is permissible "[s]o long as such coverage is addressed to the regular functions, policies and activities of such incumbents as officers involved in matters of interest to the membership, and not as candidates for re-election...." *Camarata v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 478 F.Supp. 321, 330 (D.D.C.1979). *See also, New Watch-Dog Committee v. New York City Taxi Drivers Union, Local 3036*, 438 F.Supp. 1242, 1251 (S.D.N.Y.1977). Therefore, criticism of Fuentealba regarding his handling of the AFM and his position on union policies should be given a good degree of deference by the Court in order to remain "mindful of the union's need for free and open discussion if it is to govern itself effectively." *Donovan v. Metropolitan*

*District Council of Carpenters, supra,* 797 F.2d at 145.

■■■ The determination of whether the Allegro and Overture articles violate section 401(g) is a close one, given the conflict between prohibiting promotion of a candidate through criticism of his opponent and encouraging the expression of diverse opinions on union issues. However, the continued direct and indirect personal attacks on Fuentealba in these articles constituted more than just reporting on issues that concern the union. The Court finds the series of articles in these newspapers crossed the line into impermissible electioneering based on the harsh tone of the criticism, the timing, and the references to the upcoming election contained in the articles.

*2. The article in the Intermezzo*

Defendant concedes that the article in the Intermezzo is a violation of section 401(g). Defendant argues, however, that the violation was de minimis and had no effect on the election. This argument is addressed in the section discussing whether any of the alleged violations "may have affected the outcome" of the election.

**B. THE UNION LOGOS**

The parties contest whether the term "money" under section 401(g) applies to the use of the union logos on the letters challenged here. "No moneys" of section 401(g) has been interpreted to include anything of value in order to reflect Congress' intent that no illicit support of a candidate during a union election go unrecognized. *See, Donovan v. Local Union 70, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 661 F.2d 1199, 1202 (9th Cir.1981) (use of walls of trailer owned by employer to hang campaign posters found to be use of money); *Hodgson v. Liquor Salesmen's Union, Local No. 2*, 444 F.2d 1344, 1350 (2d Cir.1971) ("§ 401(g) ... is absolute and unequivocal in its prohibition against the use of any union funds"); 29 C.F.R. § 452.78. In applying section 401(g) to the use of a union logo on a campaign advertisement, one court has noted that:

Section 401(g) does not require an actual cash outlay to establish a violation. The "logos" of the union, the credit and good-will of the union, together with the time of the union's Secretary, constitutes assets of a labor organization which cannot be used to support the candidacy of one running for union election. *Brennan v. Sindicato Empleados de Equipo Pesado, Construccion Y Ramas Anexas de Puerto Rico, Inc.,* 370 F.Supp. 872, 878 (D.P.R.1974) (campaign advertisement containing union logo and financed with union funds and services violated LMRDA). *See also, Hodgson v. United Mine Workers of America* 344 F.Supp. 17, 29 (D.D.C.1972) (campaign letter on letterhead of union was one of several violations found by court).

The use of a union logo, by itself, on campaign literature need not inevitably violate section 401(g). *Donovan v. Teamsters, Local 480,* 120 LRRM 2346, 2349 (M.D.Tenn.1985) (union logo with no market value, to which access was unlimited, and which was regularly used by candidates was not included within definition of money under section 401(g)). However, there are no facts here to indicate that the union logos have no value. Furthermore, it is clear that a union logo is a potentially valuable asset. *See e.g., Schroeder v. Lotito,* 577 F.Supp. 708, 711 (D.R.I.1983), *aff'd,* 747 F.2d 801 (1st Cir.1984). Indeed, it is hard to imagine that no objection would be raised to an outsider's use of the logos for his or her own purposes. In addition, a broad interpretation of money under section 401(g) is consistent with the intention of Congress to insure that labor organizations and their official representatives "adhere to the highest standards of responsibility and ethical conduct...." 29 U.S.C. § 401(a). The Court concludes, in accordance with the broad interpretation given this language, that the logos do constitute money under section 401(g).

Attention must next be directed to whether the use of the logos promoted the candidacy of Emerson. It is appropriate to distinguish between the *use* of the national union logo and the *use* of the logo of Local 802. Fuentealba was the President and leader of AFM. It is factually difficult to construe the use of the AFM logo as promoting the candidacy of Emerson, his opponent. Moreover, the very words of the May 27, 1987 letter indicate that it was a personal statement by Glasel criticizing Fuentealba over certain union issues. He stated, "[s]ince I'm typing this myself on my trusty word processor and paying for the printing myself it's OK to be political here." The June 2, 1987 letter was a follow up letter on the same topics, but it contained express references to Emerson. Still, the personal nature of the letters and the fact that Fuentealba was the President of AFM militate against concluding that the use of the AFM logo, by itself, in any way promoted the candidacy of Emerson.

The result is different with regard to the use of Local 802's union logo on the June 14, 1987 letter. There are no factual circumstances regarding this letter to negate the promotional effect which was created by the use of Local 802's logo by the President of Local 802 on this admitted campaign literature. Defendant defends the use of Local 802's logo by arguing that the Executive Committee of Local 802 had endorsed Emerson as a candidate. However, there exists no authority for a union executive committee to allow the use of union moneys to promote a candidate for union election. The use of the logo of Local 802 on the June 14, 1987 letter constituted a use of union moneys to promote Emerson's candidacy, in violation of section 401(g).

### C. "MAY HAVE AFFECTED THE OUTCOME"

Given the violations of section 401(g), the central issue before the Court is that of the effect the violations may have had on the outcome of the election.

The Supreme Court has held that once a violation of section 401(g) has been shown, the existence of that violation establishes a *prima facia* case that the violation may have affected the outcome of the election. *Wirtz v. Hotel, Motel & Club Employees, Local 6, supra,* 391 U.S. at 506–07, 88 S.Ct.

at 1752 (union bylaw limiting eligibility of members to run for elective office violated section 401(g)). An actual effect on the election need not be shown. *Id.*

The Secretary maintains that defendant must produce tangible evidence that the violations did not affect the outcome of the election to rebut the *prima facia* case. Defendant claims that the Court is to apply a "meaningful relationship" test under section 402(c), which would not require it to produce tangible evidence to rebut the prima facia case. Defendant relies solely on a passage from the Supreme Court's decision in *Wirtz v. Hotel, Motel & Club Employees Union, Local 6,* which stated:

[t]he proviso [to section 402(c)(2)] was intended to free unions from the disruptive effect of a voided election unless there is a meaningful relationship between a violation of the Act and the results of a particular election.

*Id.* at 507, 88 S.Ct. at 1752, (quoting from *Wirtz v. Local Union 410, Int'l Union of Operating Engineers,* 366 F.2d 438, 443 (2d Cir.1966). Defendant asserts that the Secretary has not shown the conceded violation, or any of the alleged violations, to have had a meaningful relationship to the outcome of the election.

However, defendant's interpretation of section 402(c) is misguided. The Supreme Court in *Wirtz v. Hotel, Motel & Club Employees,* explained that Congress inserted the "may have affected" language specifically to reject a narrow reading of section 402(c) in order to assure that this remedy for violations of the LMRDA was not rendered worthless. *Id.* 391 U.S. at 505–06, 88 S.Ct. at 1751. Moreover, the Supreme Court noted that the union defendant in that case had not produced "tangible evidence against the reasonable possibility that the ... [violation] did affect the outcome" and stated that "conjecture" was insufficient to rebut the *prima facie* case. *Id.* at 508, 88 S.Ct. at 1752. *See also, Donovan v. Local 719 United Auto., Aerospace and Agricultural Implement Workers of America, supra,* 561 F.Supp. at 59; *Hodgson v. Liquor Salesmen's Un-*

*ion, Local No. 2, supra,* 334 F.Supp. at 1368.

Courts have consistently interpreted section 402(c) broadly, and have found that even minute expenditures of money in violation of section 401(g) may have affected the outcome. *See Donovan v. International Union of Operating Engineers, Local No. 369,* 593 F.Supp. 669, 671 (W.D. Tenn.1984), *aff'd sub nom. Brock v. International Union of Operating Engineers, Local No. 369,* 790 F.2d 508 (6th Cir.1986) (even "minimal" expenditure actionable); *Marshall v. Office and Professional Employees Union, Local 2,* 505 F.Supp. 121, 122–23 (D.D.C.1981) ($6.40 violative expenditure "may have affected outcome" of election); *Schultz v. Local Union 6799, United Steelworkers of America,* 426 F.2d 969, 972 (9th Cir.1970), *aff'd sub nom. Hodgson v. Local 6799, United Steelworkers of America,* 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971) (de minimis argument rejected); *Usery v. Stove, Furnace & Allied Appliance Workers International Union of North America, AFL–CIO,* 547 F.2d 1043, 1045 (8th Cir.1977) (under the LMRDA, "it makes no difference that the amount spent was small").

Furthermore, in cases after *Wirtz v. Hotel, Motel & Club Employees,* courts have not only held that tangible evidence is necessary to rebut the *prima facie* case, but also that the burden placed on defendant may be "so great as to be insurmountable in some cases." *Usery v. International Organization of Masters, Mates and Pilots,* 422 F.Supp. 1221, 1226–27 (S.D.N. Y.), *aff'd,* 538 F.2d 946 (2d Cir.1971). *See Hodgson v. Liquor Salesmen's Union, Local No. 2, supra,* 334 F.Supp. at 1369; *Donovan v. Local 719, United Automobile Aerospace and Agricultural Implement Workers of America, supra,* 561 F.Supp. at 60. In fact, no case has been presented to the Court where a violation was found to have been committed by the victorious party in a union election and a Court allowed that election to stand. Accordingly, defendant's position that it need not produce tangible evidence to rebut the *prima facia*

case established by a violation must be rejected.

Defendant further asserts that the convention election in this case is fundamentally different than a direct membership election. The "may have affected the outcome" standard has apparently never been applied in connection with a convention election. In the election at issue here, each side vigorously campaigned the delegates at the Convention. Literature clearly legitimate under the LMRDA was circulated to the delegates at the Convention which contained much more hard-hitting criticism of Fuentealba than anything contained in either the articles or the letters challenged by the Secretary. Some of this material was signed by Guse, Fleischer, and Glasel. In light of this subsequent campaigning, defendant claims the violations had no effect on the election outcome.

■ However, defendant's assertions regarding the convention election, in the absence of more tangible evidence regarding the effect of the violations, fail to meet the substantial burden required to rebut the *prima facia* case. Despite the additional legitimate campaigning that occurred at the Convention, a reasonable possibility exists that the challenged articles and letters may have contributed to the effectiveness of the overall campaign to unseat Fuentealba. Moreover, in the absence of tangible evidence, the Court is in a position only to speculate regarding the interplay among the violations and the lawful campaign activity. As noted above, conjecture as a means of satisfying the defendant's burden has been expressly repudiated by the Supreme Court. *Wirtz v. Hotel, Motel & Club Employees, Local 6, supra,* 391 U.S. at 508, 88 S.Ct. at 1752. This Court likewise declines to undertake such a speculative analysis.

Additionally, the margin of votes which decided the election was extremely small. Because certain delegates had more than one vote at the convention, it is possible that the votes of as few as four delegates could have changed the outcome of the election. Courts have been especially ready to find the standard of section 402(c)

violated when an election is decided by a small number of votes. *See Brock v. Metropolitan District Council of Carpenters,* 653 F.Supp. 289, 293 (E.D.Pa.1986); *Hodgson v. Liquor Salesmen's Union, Local No. 2, supra,* 334 F.Supp. at 1371–78.

In sum, defendant has neither produced any tangible evidence to rebut the *prima facie* case nor put any genuine issue of material fact in dispute. Since the violations here satisfy the "may have affected the outcome" requirement of section 402(c), a new election must be ordered under the supervision of the Secretary.

## D. EMPLOYER MONEYS

The above discussion moots the issue of summary judgment for defendant on this claim.

## CONCLUSION

The Secretary's motion for summary judgment is granted and defendant's motion for summary judgment is denied. The June 1987 election for President of AFM is hereby declared null and void. A new election is ordered, to be conducted under the supervision of the Secretary and, so far as lawful and practicable, in conformity with the Constitution and Bylaws of AFM. Pursuant to section 402(c), the Secretary shall certify to the Court the name of the person elected promptly after the completion of the election so the Court may enter a decree declaring such person to be the President of AFM.

Settle order on notice.