**Elizabeth DOLE, Secretary of Labor, United States Department of Labor, Plaintiff,**

**v.**

**FEDERATION OF POSTAL POLICE OFFICERS, INC., Defendant.**

**No. CV 88–3786.**

United States District Court, E.D. New York.

June 29, 1990.

414

Andrew J. Maloney, U.S. Atty. by Bruce H. Nims, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Phillips, Cappiello, Kalban, Hofmann & Katz, P.C. by Ned R. Phillips, New York City, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Secretary of the United States Department of Labor (the "Secretary") brings this action pursuant to section 402(b) of the Labor–Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 482(b), requesting this Court to set aside the election of certain officials in an election held in June 1988 by the Federation of Postal Police Officers ("FPPO"), and to order a new election subject to the Secretary's supervision. The Secretary alleges that the FPPO violated the prohibition on union-financed electioneering imposed by section 401(g) of the LMRDA, 29 U.S.C. § 481(g). Presently before the Court are the Secretary's motion for summary judgment and defendant's cross-motion for summary judgment. For the reasons below, both motions are granted in part and denied in part.

## I. BACKGROUND

### A. *The FPPO and the June 1988 Election*

The material facts not genuinely in dispute as taken from the papers in support of and in opposition to the respective motions and the parties' stipulation of uncontested facts can be summarized briefly. The FPPO represents approximately 1000 members who are employed by the United States Postal Service providing security at post offices throughout the country. Union members pay their dues—$13 per month—either directly to the FPPO or through a payroll deduction system.

The FPPO is broken down into five geographical districts with the districts further subdivided into thirty-three locals. As provided in the FPPO constitution, the national officers are the president, vice-president and secretary-treasurer. Prior to the June 1988 election, these positions were held by Sebastian Russo ("Russo"), Willie J. Brock ("Brock"), and William J. Carlin ("Carlin"), respectively. The constitution provides that elections of national and district officers are to be held every three years with nominations commencing and concluding in January and voting occurring between March 25, when secret ballots are sent out, and April 16, when the ballots are counted.

An election was scheduled for 1988 to fill thirteen positions: national president, vice-president and secretary-treasurer; five district presidents; and five district vice-presidents. All three incumbent national officers were running for reelection. Nomination notices, however, were not posted until sometime in February 1988, and the deadline for filing nominations was March 14, 1988. As for the voting, separate ballots for the national offices and district offices were mailed to the members from Chicago, Illinois on May 25, 1988, and were received back in Memphis, Tennessee by June 15, 1988, and counted that same day by the Union's Election Committee. The Election Committee was chaired by Darryl Bell ("Bell"), who was elected to that position by the National Executive Council ("Executive Council") at a January 13, 1988 annual meeting in St. Louis, Missouri. Under the FPPO constitution, the national officers and the district presidents constitute the Executive Council.

As reported by the Election Committee, the result of the voting for the office of secretary-treasurer was as follows: Carlin, 188 votes; Clifford Sledge ("Sledge"), 162 votes; and J. Walker ("Walker"), 126 votes.[1] The FPPO constitution, however,

1. A subsequent tally by the United States Department of Labor, Office of Labor–Manage-

requires that to be elected to a national office a candidate must receive 40% of the votes cast for that office. Because Carlin needed 190.8 votes to reach the 40% mark, he failed to be elected by 2.8 votes. Under the constitution, a runoff election between the two top candidates became necessary. Thereafter, ballots for the runoff between Carlin and Sledge were mailed out on June 21, 1988, and counted on July 7, 1988 by the Election Committee. The result: Sledge, 203 votes; Carlin, 198 votes.

As for the offices of national president and national vice-president, Russo and Brock were both reelected by relatively wide margins: Russo defeated challengers Richard Bailey and Michael Singleton, 286 votes to 125 and 77 votes, respectively; Brock defeated challengers Raymond Greatorex, Perry Bautista, and Daniel Maggi, 312 votes to 91, 41, and 39, respectively.[2]

All newly-elected officers were installed on July 22, 1988.

### B. *The Newsletters and the Charges at the Union Level*

By letter dated June 13, 1988, from Carlin to Russo and Brock, Carlin charged Russo and Brock with the improper use of union funds and union publications for campaign purposes.[3] In the letter, Carlin referred to statements made in four editions of the FPPO's monthly newsletter, "Communique."

Signed by Russo and Brock, Communique is authored by Brock from his home in St. Louis, Missouri, and sent to Russo's home in New York, where Russo reviews its content and prepares it for distribution. As for the cost of producing and distributing editions of Communique, though it is typed gratis by Brock's sister on her own typewriter, Russo makes about fifty copies on a union-owned copier for distribution to

the thirty-three union locals and to the individual union officials. Although Russo initially pays the cost of the copy paper, envelopes and postage, he submits monthly vouchers to the FPPO, which reimburses him for these costs.

In the June 13 letter, Carlin specifically referred to the following statements made in the April 21, 1988 Communique:

> Our National and District elections will get under way as soon as the National Secretary/Treasurer, Bill Carlin sends the funds for the election to the chairman of said committee. These funds were approved by the National Executive Council in January of this year at a meeting in St. Louis, Missouri. A competent Secretary Treasurer [sic] would have released funds immediately for such an important event.

Attached to the June 13 letter were copies of the May 26, 1987, February 17, 1988, April 21, 1988, and May 19, 1988 Communiques. In addition to the portion of the April 21 Communique quoted above, the challenged portions of these newsletters allegedly praising Russo and Brock and criticizing Carlin read as follows:

1. May 26, 1987 Communique:

> IX. BUDGET REPORT, NATIONAL SECRETARY/TREASURER
>
> A. The Secretary/Treasurer reported that the National Treasury has been operating at a 14.9% deficit since July 5, 1986 through February 28, 1987. Mr. Carlin failed to mention that these figures included the National Convention ($50,000.00) and more successful arbitrations, each ($4000.00) [sic], Step IV grievances and Labor–Management meetings than the prior administration had in years! Mr. Carlin also *failed* to mention that the National Treasury is equal or greater than the amount that

---

ment Standards ("OLM") showed the following result: Carlin, 188 votes; Sledge, 161 votes; and Walker, 128 votes. The record does not indicate the reason for this discrepancy.

2. The Election Committee's tally and the subsequent OLM count were identical for these two offices.

3. According to the record, there is no provision in the FPPO constitution for an election appeal procedure; however, the constitution does provide that charges against any national officer shall be filed in writing with the national secretary-treasurer and members of the FPPO Contract/Constitution Committee, referred to as the "Trial Board." The composition of the Trial Board is defined in the constitution.

was turned over to us by our past President and past Secretary/Treasurer.

B.  Mr. Carlin submitted new proposed guidelines for reporting and limiting certain expenses.  This proposal was unanimously rejected by the Council.

.        .        .        .        .

## XII.  UNION BOOKKEEPER

A.  The union pays a bookkeeper $75.00 a month to assist Mr. Carlin as Secretary/Treasurer.  The union has retained this person since Mr. Carlin became Secretary/Treasurer for a short period of time until Mr. Carlin can function as Secretary/Treasurer without any help from others.  The Council voted six votes to retain the bookkeeper and one to dismiss the bookkeeper.  The National President did not vote and the National Vice–President voted to dismiss the bookkeeper.  (Emphasis in original).

2.  February 17, 1988 Communique:
This is the first time the Federation has ever sought a court injunction against Management and argued this issue in the presence of an Arbitrator. National President, Russo and National Vice–President, Brock were successful in obtaining the court injunction and were the Federation's primary witnesses during the arbitration.

.        .        .        .        .

In July of 1986, Mr. Russo became our National President and in October, 1986, I became our National Vice President.  Since that time, we have won 75% of all our arbitrations when the National average of success rates are 24%.  We have won over 80% of all step IV grievances.

3.  April 21, 1988 Communique:
The Federation has chosen the law firm of Wunder and Diefenderfer of Washington, D.C. to lobby for our Twenty Year Retirement.  The law firm has informed us that they, "Do have optimism that we can win this Twenty Year Retirement status according to law."  If things go as

planned, we will have achieved our goal by the end of the current National Agreement, if Mr. Russo and I are still in office.

4.  May 19, 1988 Communique:
On June 8, 1988, Mr. Russo and I have scheduled a meeting with Congressman William D. Ford, Chairman of the House Committee on Post Office and Civil Service concerning our Twenty Year Retirement Plan.  Our Lobbyist, Mr. William M. Diefenderder, will also attend this meeting.

Congressman Ford's Committee will hold a hearing on our *Twenty Year Retirement Plan on Friday, June 24, 1988 in Washington, D.C.  I am scheduled to testify at these hearings on the opening day.*  (Emphasis in original).

By letter dated June 27, 1988, to the "National Officers, National Executive Council," Carlin filed charges against Russo and Brock alleging irregularities in the conduct of the protested elections.  Soon thereafter, Carlin demanded a recount of the June 15 election and the July 7 runoff in a July 18, 1988 letter to Election Committee chairman Bell.  By letter dated July 25, 1988, Russo informed Carlin that his June 13, June 27 and July 18 letters and any charges therein were being referred to the Executive Council for its recommendation.  In an August 6, 1988 letter to Russo, Carlin objected to the referral to the Executive Council, contending that the charges should have been referred to the Trial Board according to the FPPO constitution. According to Russo, the Executive Committee found Carlin's charges groundless and referred the charges to the Trial Board, which has not issued a decision.

On October 6, 1988, Carlin filed a written election appeal with the United States Department of Labor, Office of Labor–Management Standards ("OLM").  The OLM found Carlin's appeal timely because three months had passed since Carlin invoked any remedies available through the FPPO and no final decision had been obtained.  *See* 29 U.S.C. § 482(a)(2) (member of union who has invoked remedies avail-

able under union's constitution and bylaws without obtaining a decision within three months may file complaint with Secretary within one month thereafter). Upon investigating Carlin's complaint, the Secretary found probable cause to believe that a violation of the LMRDA had occurred, and commenced this action on December 5, 1988. *See* 29 U.S.C. § 482(b).

## II. DISCUSSION

### A. *Summary Judgment Standard*

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). The burden is upon the moving party to clearly establish the absence of a genuine issue as to any material fact, and "a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Donahue*, 834 F.2d at 57. Since the presence of only a genuine and material issue of fact precludes the entry of summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), the summary judgment procedure allows a court to determine whether a trial is necessary. Further, on a motion for summary judgment, a court must be mindful that its role is not to try issues of fact, but to determine whether there are issues to be tried. *Donahue*, 834 F.2d at 58.

As noted above, both parties have moved for summary judgment. The Court is mindful that on cross-motions for summary judgment, neither motion can be granted unless the moving party is entitled to judgment as a matter of law upon genuinely undisputed facts. *Bank of Am. Nat'l Trust & Savs. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir.1985); *McLaughlin v. American Fed. of Musicians*, 700 F.Supp. 726, 732 (S.D.N.Y.1988); *Cottone v. Blum*, 571 F.Supp. 437, 441 (W.D.N.Y.1983). Indeed, the fact that both sides move for summary judgment "does not make it more readily available." *Home Ins. Co. v. Aetna Cas. & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976).

In a case dealing with alleged violations of § 481(g), where the material facts are not in dispute, summary judgment is appropriate as to the question of whether there has been a violation of the statute and whether such violation may have affected the outcome of the election. *American Fed. of Musicians*, 700 F.Supp. at 732; *see Donovan v. National Alliance of Postal & Fed. Employees*, 566 F.Supp. 529, 533 (D.D.C.1983), *appeal dismissed*, 740 F.2d 58 (D.C.Cir.1984); *Donovan v. Local 719, United Auto., Aerospace & Agric. Implement Workers*, 561 F.Supp. 54, 60 (N.D. Ill.1982); *Usery v. International Org. of Masters, Mates & Pilots*, 422 F.Supp. 1221, 1227–30 (S.D.N.Y.), *aff'd in part, modified in part*, 538 F.2d 946 (2d Cir.1976). With the above principles in mind, the Court turns to address the motions.

### B. *Applicable Statutes and Interpretive Regulations*

The purpose of Title IV of the LMRDA is "to insure free and democratic union elections." *Wirtz v. Local Union No. 125, Laborers' Int'l Union*, 389 U.S. 477, 483, 88 S.Ct. 639, 642, 19 L.Ed.2d 716 (1968); *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 470, 88 S.Ct. 643, 647, 19 L.Ed.2d 705 (1986). "The LMRDA is expressly designed 'to prevent, discourage, and make unprofitable, improper conduct on the part of union officials, employers and their representatives.'" *American Fed. of Musicians*, 700 F.Supp. at 732 (quoting S.Rep. No. 187, 86th Cong., 1st Sess., *reprinted in* 1959 U.S.Code Cong. & Admin.News 2318, 2321).

As noted above, the Secretary alleges violations of 29 U.S.C. § 481(g), which provides:

No moneys received by any labor organization by way of dues, assessment or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of

this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

This proscription clearly and unambiguously bars the spending of even seemingly trivial amounts of union funds for electioneering. *See, e.g., Donovan v. Metropolitan Dist. Council of Carpenters*, 797 F.2d 140, 145 (3d Cir.1986); *Usery v. Stove, Furnace & Allied Appliance Workers Int'l*, 547 F.2d 1043, 1045 (8th Cir.1977); *Shultz v. Local Union 6799, United Steelworkers*, 426 F.2d 969, 972 (9th Cir.1970), *aff'd*, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971); *Hodgson v. Liquor Salesmen's Union, Local No. 2*, 334 F.Supp. 1369, 1378 (S.D.N.Y.), *aff'd*, 444 F.2d 1344 (2d Cir. 1971).

In addition, the Department of Labor has promulgated a regulation interpreting this proscription as it relates to union-financed publications. The regulation, found at 29 C.F.R. § 452.75, provides:

> The provisions of [§ 481(g)] prohibit any showing of preference by a labor organization or its officers which is advanced through the use of union funds to criticize or praise any candidate. Thus a union may neither attack a candidate in a union-financed publication nor urge the nomination or election of a candidate in a union-financed letter to the members. Any such expenditure, regardless of amount, constitutes a violation of [§ 481(g)].

Another relevant interpretive regulation provides that election "campaigning must not involve expenditure of funds in violation of section [481(g)]. Accordingly, officers and employees may not ... use union funds, facilities, equipment, stationery, etc., to assist them in such campaigning." 29 C.F.R. § 452.76.

■ In evaluating whether a union-financed publication violates § 481(g), the Court must consider the tone, content and timing of the publication. *See Metropolitan Dist. Council of Carpenters*, 797 F.2d at 145; *Usery v. International Org. of Masters, Mates & Pilots*, 538 F.2d 946, 949

(2d Cir.1976); *Brock v. Connecticut Union of Tel. Workers, Inc., Local 400*, 703 F.Supp. 202, 206 (D.Conn.1988); *American Fed. of Musicians*, 700 F.Supp. at 732–33; *National Alliance of Postal & Fed. Employees*, 566 F.Supp. at 532; *Local 719, United Auto., Aerospace & Agric. Implement Workers*, 561 F.Supp. at 58. Considered under the totality of the circumstances, otherwise permissible statements may take on a different hue when viewed against the backdrop of an election campaign. And while a union-financed publication may cover "factual notices or statements of interest to the members," *Local 719, United Auto., Aerospace & Agric. Implement Workers*, 561 F.Supp. at 57, and "newsworthy activities of an incumbent [or challenger] running for office," *National Alliance of Postal & Fed. Employees*, 566 F.Supp. at 532, the line between reporting such facts or activities and between promoting or attacking a candidate can be fine. Thus, even "[c]overage of newsworthy activities of the incumbent may be so excessive as to 'render it campaign literature on behalf of the incumbent.'" *Id.* (quoting *Camarata v. International Bhd. of Teamsters*, 478 F.Supp. 321, 330 (D.D.C.1979)).

If the court finds that a violation of § 481(g) "*may have affected the outcome of an election*, the court shall declare the election ... void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization." 29 U.S.C. § 482(c)(2) (emphasis added). As the Supreme Court has held, a proved violation of § 481 establishes a prima facie case that the violation may have affected the outcome of the election. *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 506–07, 88 S.Ct. 1743, 1751–52, 20 L.Ed.2d 763 (1968). In the context of a violation of § 481(g), this prima facie case may be rebutted by "tangible evidence" supporting a finding that the union-financed publication did not affect the result. *See id.* at 507, 88 S.Ct. at 1752; *International Org. of Masters, Mates & Pilots*, 538 F.2d at 949; *American Fed. of*

*Musicians,* 700 F.Supp. at 737; *National Alliance of Postal & Fed. Employees,* 566 F.Supp. at 533; *Local 719, United Auto., Aerospace & Agric. Implement Workers,* 561 F.Supp. at 59. The burden falling on a defendant once a violation of § 481(g) has been established can be quite significant, and may, in fact, be impossible to overcome. *See International Org. of Masters, Mates & Pilots,* 538 F.2d at 949; *Liquor Salesmen's Union, Local No. 2,* 334 F.Supp. at 1378.

As a prerequisite to a union member filing a complaint with the Secretary, the member must first have either exhausted his available union remedies or at least invoked those remedies without obtaining a final decision within three months. 29 U.S.C. § 482(a)(2); *see Local 153, Glass Bottle Blowers Ass'n,* 389 U.S. at 472, 88 S.Ct. at 648; *Liquor Salesmen's Union, Local No. 2,* 334 F.Supp. at 1374–77. "The first step in Title IV enforcement is for a union member to challenge the election through internal union procedures. The Secretary ... has no duty or authority to investigate a complaint until union procedures have been exhausted or have proven futile." *Donovan v. CSEA Local Union 1000, Amer. Fed. of State, County & Mun. Employees,* 784 F.2d 98, 103 (2d Cir.1986). Upon filing of the complaint with the Secretary, the Secretary is required to investigate the complaint, and, if the Secretary finds probable cause to believe a violation had occurred, the Secretary must bring a civil action against the union within sixty days from the filing of the complaint. 29 U.S.C. § 482(b). At that point, "[t]he Secretary may seek to overturn an election only on grounds raised in 'some discernible fashion' by the union member's protest to the union." *CSEA Local Union 1000, Amer. Fed. of State, County & Mun. Employees,* 784 F.2d at 103 (quoting *Hodgson v. Local 6799, United Steelworkers,* 403 U.S. 333, 340–41, 91 S.Ct. 1841, 1846, 29 L.Ed.2d 510 (1971)).

#### C. *Challenge by the Secretary to the June 1988 Election*

The Court notes that this action was filed by the Secretary within sixty days of the filing of the complaint by Carlin, and after the Secretary's investigation of that complaint and her finding of probable cause to believe a violation of § 481(g) had occurred. In this action, the Secretary contends that union funds were used unlawfully by Russo and Brock to promote their candidacies and to thwart Carlin's. In this regard, the Secretary claims that the distribution of the above noted editions of Communique violated § 481(g), and, because these publications may have affected the outcome of the elections for the national offices, the Secretary asks this Court to set aside the June 1988 election for all three national offices and to direct a new election for these offices under the Secretary's supervision pursuant to § 482(c)(2).

Defendant initially contends that the Secretary may only challenge the election as to the office of national secretary-treasurer and not as to the offices of national president or national vice-president. Defendant contends that the protest made at the union level by Carlin, was directed only to the election for secretary-treasurer. Thus, defendant argues, there was no exhaustion of remedies at the union level as to the elections for president and vice-president. Defendant notes the unusual situation here in that the complaining union member, a defeated incumbent, did not charge his opponent with any improper conduct but instead charged two successful incumbents with using union funds to praise themselves and criticize him, notwithstanding none of the defeated challengers for those two offices have complained. In any event, defendant contends that the challenged newsletters were permissible because they were of factual reports of union and union-related functions and activities. Defendant maintains, nevertheless, that if the Court were to find a violation of § 481(g) based on the statements in the April 21 newsletter (concerning Carlin), which defendant characterizes as "the only evidence which could remotely suggest partisanship in the election," it was de minimis, and, therefore, does not warrant setting the election aside and ordering a new election. Defendant maintains that ordering a new election

would be particularly inappropriate because the next election is less than nine months away. Rather, defendant suggests, the appropriate remedy would be to order that the next regularly scheduled election be conducted under the Secretary's supervision.

The Court will first address the question of exhaustion or invocation of union remedies, and then the question of whether there has been a violation of § 481(g), and, if so, whether the violation may have affected the outcome of the elections.

### D. Exhaustion or Invocation of Union Remedies

■ Defendant does not contend that Carlin failed to comply with the exhaustion requirement, *see* 29 U.S.C. § 482(a)(2), insofar as he complained that the election for the office of national secretary-treasurer had been tainted by union-financed campaign literature. Defendant contends, however, that the charges asserted by Carlin at the union level were limited to the newsletter statements about him, and, therefore, he was only challenging the propriety and effect of union-financed campaign literature on the election for secretary-treasurer. In short, defendant argues that the FPPO had not been put on notice nor given the opportunity to consider claims of improper use of union-financed publications concerning the offices of national president or vice-president.

The Secretary, on the other hand, contends that Carlin's June 13, 1988 letter (to which the four challenged newsletters were attached) to Russo and Brock, charging them with violating the FPPO constitution and Department of Labor regulations governing union-financed electioneering, adequately put the FPPO on notice that Carlin was complaining that the editions of Communique had tainted the elections in all three national offices. To support this position, the Secretary refers to Carlin's June 13 letter, wherein Carlin stated that the newsletters "illustrate the unfair manner that our newsletter has been manipulated by you for your own selfish interests." By this letter, the Secretary maintains that

Carlin adequately put before the FPPO the question of whether union funds had been used unlawfully with respect to the elections of all three national offices.

This Court finds merit to the Secretary's argument that, although Carlin apparently stressed that he was improperly derided by Russo and Brock in the April 21, 1988 newsletter, fairly read, the June 13 letter charged that Russo and Brock had unlawfully used union funds to attack his candidacy as well as to promote their own. Indeed, the February 17 and May 19, 1988 newsletters, attached to the June 13 letter, do not even mention Carlin. Under the circumstances, the union was given adequate notice that the elections in all three national offices may have been tainted by prohibited union-financed publications. The union has not shown otherwise. *Hodgson v. Local 6799, United Steelworkers*, 403 U.S. 333, 340–41, 91 S.Ct. 1841, 1846, 29 L.Ed.2d 510 (1971) ("[C]ourts should impose a heavy burden on the union to show that it could not in any way discern that a member was complaining of the violation in question.").

### E. The Newsletters and § 481(g)

■ There is no question but that the challenged newsletters were union financed. As for the April 21, 1988 newsletter, because of the timing of its distribution and the patently derogatory comment concerning Carlin, it was prohibited campaign literature in violation of § 481(g). *See, e.g., International Org. of Masters, Mates & Pilots*, 538 F.2d at 949 (union-financed newsletter laudatory of incumbent and derogatory of opponent distributed during election campaign violative of § 481(g)). However, this violation only bears the election for the office of secretary-treasurer. Based on the Court's finding, the Court need not determine whether the May 26, 1987 newsletter also violated § 481(g) as campaign literature attacking Carlin. Nevertheless, the Court notes that the timing of its distribution weighs heavily against a finding that it violated § 481(g). Distributed well over seven months before nominations were even to be submitted in

the 1988 elections, and nearly nine months before they were actually submitted, this edition was considerably removed from the heat of the 1988 election campaign. Further, there are no allegations that this newsletter was recirculated or that portions were repeated or highlighted at any time closer to the election.

As to the question of whether the challenged newsletters violated § 481(g) insofar as the offices of president and vice-president are concerned, this Court finds that upon considering their timing, tone and content, they did not. Taken individually, in the context of the particular edition, or as a whole, the statements in the challenged newsletters were within the confines of proper reporting of facts, statements of interest to the members, and newsworthy activities of incumbents engaged in matters of interest to the members. *See Camarata v. International Bhd. of Teamsters,* 478 F.Supp. 321, 330 (D.D.C.1979). In the Court's view, Russo's and Brock's coverage of newsworthy items relating to union and union-related activities had not become so excessive as to render the newsletters prohibited campaign literature on their behalves. *See id.*

### F. *May Have Affected the Outcome*

As noted above, the statements in the April 21, 1988 newsletter, concerning Carlin, violated § 481(g). Consequently, the violation establishes a prima facie case that the violation may have affected the outcome of the election for secretary-treasurer. *See Hotel, Motel & Club Employees Union, Local 6,* 391 U.S. at 506–07, 88 S.Ct. at 1751–52. Rather than producing tangible evidence to rebut the Secretary's prima facie case or to raise a genuine issue of material fact as to the affect of the violation on the election for secretary-treasurer, defendant has taken the position that no violation had occurred, or, alternatively, that if the Court finds a violation based on the statements in the April 21, 1988 newsletter, the violation was de minimis and does not warrant a new election. Even "if there is only a single violation and a minimal one at that, [though] it may be more easily rebutted, ... it must be met by evidence which supports a finding that the violation did not affect the result." *Stove, Furnace & Allied Appliance Workers Int'l,* 547 F.2d at 1046. Because defendant makes no such showing, the Court finds that the violation may have affected the outcome of the election for secretary-treasurer. Accordingly, that election must be set aside and a new election ordered.

Section 482(c)(2) clearly mandates that upon finding that a violation of § 481(g) may have affected the outcome of an election, the court shall declare the election void and order a new election. This Court does not agree with defendant that, under the circumstances of this case, the appropriate remedy is to direct that the next regularly scheduled elections be under the Secretary's supervision.

### CONCLUSION

Based on the reasons above, the Secretary's motion for summary judgment is granted to the extent that the election for the office of secretary-treasurer is set aside and a new election is directed for that office, but is otherwise denied; and, the defendant's motion for summary judgment is granted to the extent that the complaint is dismissed insofar as it seeks to set aside the elections for the offices of president and vice-president, but is otherwise denied. Accordingly, the June 1988 election for secretary-treasurer is set aside and a new election for this office is hereby ordered to be conducted within ninety days of the date of this order under the Secretary's supervision pursuant to § 482(c).

SO ORDERED.