Elaine L. CHAO, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**NORTH JERSEY AREA LOCAL POSTAL WORKERS UNION, AFL–CIO, Defendant.**

Civ. No. 01–1536(DRD).

United States District Court, D. New Jersey.

June 27, 2002.

---

**36.** *See* note 3, *supra.*

Jeffrey S. Rogoff, Office of the Regional Solicitor, U.S. Department of Labor, New York City, for Plaintiff.

Craig H. Livingston, Samer E. Khalaf, Ball Livingston, Nutley, NJ, for Defendant.

## OPINION

DEBEVOISE, Senior District Judge.

This action by the plaintiff Secretary of Labor seeking an order pursuant to § 402(b) of the Labor Management Re-

porting and Disclosure Act of 1959 nullifying a union election for nine office positions and directing a supervised new election for those offices comes before the court on the plaintiff Secretary of Labor's motion for summary judgment, the Defendant North Jersey Area Local, Postal Workers Union, AFL–CIO's motion for summary judgment, and the plaintiff Secretary of Labor's cross-motion for summary judgment on the defendant's affirmative defenses. For the reasons set forth below, the plaintiff Secretary of Labor's motion for summary judgment will be granted, the defendant North Jersey Area Local, Postal Workers Union, AFL–CIO's motion for summary judgment will be denied, and the plaintiff Secretary of Labor's cross-motion for summary judgment will be granted.

### STATEMENT OF FACTS

The defendant, North Jersey Area Local ("NJAL" or "the Local") represents approximately 2,700 employees in postal facilities in northern and central New Jersey.(Rogoff Declaration, Exh. 4, at pp. 42–44, 52–53, and Exh. 6 at p. 17). In 1991, NJAL president Gary Weightman ("Weightman") and NJAL Secretary Treasurer John McGovern ("McGovern") were first elected to their respective offices. (Rogoff Declaration, Exh. 4 at p. 41). Weightman and McGovern were re-elected in 1994, 1997, and a regular triennial election was scheduled for April 2000. (Rogoff Declaration, Exh. 4 at pp. 65–67 and Exh. 6 at p. 31). In past elections, Weightman and McGovern ran on a slate together called the "Real Deal". (Rogoff Declaration, Exh. 4 at p. 41, and Exh. 6 at pp. 31–32). For the election in 2000, the Real Deal slate pooled its campaign funds and distributed joint campaign materials. (Rogoff Declaration, Exh. 4 at p. 81, and Exh. 6 at pp. 37–38). In addition to personally distributing campaign material, the Real Deal slate made three or four official mailings prior to the 2000 election. (Rogoff Declaration, Exh. 4 at pp. 77–78, and Exh. 9).

Dennis Bowie ran for President against Weightman on the "Keepin it Real In the New Millenium" slate (the "New Millenium slate") which fielded candidates for nine out of ten full time office positions which were to be filled. (Rogoff Declaration, Exh. 3 at pp. 37–38, Exh 8, Exh. 10). The New Millenium slate included candidates for the offices of President, Executive Vice President, Secretary–Treasurer, Director of Industrial Realtions, Legislative Aide, Administrative Aide, Associate Editor, Chief Steward (NEWARK) and Chief Steward (PATERSON).[1] Like the Real Deal slate, the New Millenium slate campaigned together as a slate and distributed several campaign flyers. (Rogoff Declaration, Exh. 3 at. Pp. 37–38, Exh. 6 at pp. 36–37, and Exh. 10). A third slate led by Eddy Lanoue also fielded candidates in the 2000 election. (Rogoff Declaration, Exh. 3 at p. 38 and Exh. 4 at p. 73).

Nominating petitions for the 2000 election were submitted in February 2000. (Gerchak Affidavit, ¶ 7). The mail ballots were scheduled to be received by the members of the Local by March 31, 2000, and returned by April 18, 2000. (Gerchak Affidavit, ¶ 8). The vote was overseen and counted by the NJAL Election Committee. (Rogoff Declaration, Exh. 3 at p. 38 and Exh. 11). On April 19, 2000, the Election Committee sent a letter announcing the results of the election. *Id.* Weightman was once again re-elected as President. Weightman received 670 votes, Lanoue re-

---

1. The New Millenium's candidate for the position of Director of Industrial Relations with-

drew from the race and did not appear on the ballot.

ceived 300 votes, and Bowie received 290 votes. (Defendants' Exhibit M). However, of the 1260 votes cast, candidates on the Real Deal slate were elected by voter margins ranging from 4 to 540. (Rogoff Declaration, Exh. 3 at 38 and Exh. 11).

In the 2000 election, the Real Deal slate initially supported Jack Dougherty ("Dougherty") for Executive Vice President. However, the Real Deal shifted its support to another candidate Frank Tie prior to the election after Weightman and Dougherty had a falling out.(Rogoff Declaration, Exh. 6 at pp. 31–36). Frank Tie ultimately won the office. *Id.*[2]

On or about March 3, 2000, the National Union of the American Postal Workers Union ("the National") announced to its local unions that it would waive the National's portion of an upcoming dues increase and challenged the locals to follow suit. (Rogoff Declaration, Exh. 29) Weightman felt that the Local should waive its portion of the dues increase because "[o]ur members are angry" about "lousy" contracts with low wage increases, and waiving the dues increase "would maybe be the right thing to do to make them happy." (Rogoff Declaration, Exh. 4 at pp. 104–109, and Exh. 6 at 42). Feeling "politically boxed in" and reacting to the pressure, President Weightman and Secretary Treasurer McGovern recommended to the Local's Executive Board that the Local waive its portion of the dues increase. (Rogoff Declaration, Exh. 4 at pp. 104–109, and Exh. 6 at p. 42).

The Local's Executive Board consisted of approximately twenty-five members. (Rogoff Declaration, Exh. 4 at pp. 104–109, and Exh. 6 at p. 42). The Executive Board's voting procedure required the Board members to be polled on various issues either by telephone or in person several times a year. (Rogoff Declaration, Exh. 6 at pp. 26–27). The votes of the individual Executive Board members are usually not identified or announced to the Local's members. (Rogoff Declaration, Exh. 4 at pp. 59–60, and Exh. 6 at p. 28). According to McGovern, everyone on the Executive Board voted in favor of the dues waiver except Bowie. (Rogoff Declaration, Exh. 4 at pp. 118, 124–126). Within a few days of the Executive Board's vote, the Local sent out a mailing to all members of the Local which bore the Local's logo and was written on the Local's letterhead stationary of President Weightman and Secretary Treasurer McGovern ("the Weightman–McGovern mailing"). (Rogoff Declaration, Exh. 4 at pp. 99–100, 114–115 and Exh. 12). All costs associated with this mailing to the 2700 members were paid by the Local. (Exh. 4 at pp. 99–100, and Exh. 6 at p. 45). The mailing's caption announced that the Local's Executive Board "ADOPTS REQUEST OF PRESIDENT & Secretary Treasurer" to waive the dues increase. (Rogoff Declaration, Exh. 12)(emphasis in original). The mailing further announced that the Executive Board had voted "overwhelmingly" to waive the Local portion of the dues increase, and in a footnote in small print stated that "[o]nly Director of Industrial Relations Dennis Bowie voted to raise the dues." *Id.* The mailing further stated that Weightman and McGovern had recommended the waiver "since the good financial condition of the Local would allow this." *Id.* The mailing concluded by assuring members that the battle against abusive management and postal privatization would go on. *Id.* The mention of Bowie's vote in the Weightman–McGovern mailing

---

**2.** Although the Local relies on Frank Tie's success in support of its contention that not all members of the Real Deal slate were victo-

rious, Weightman unequivocally testified that he supported Frank Tie in the election instead of Jack Dougherty.

included the only time an Executive Board member's vote was ever specifically identified and published to the membership. (Rogoff Declaration, Exh. 4 at pp. 59–60, 125–126, and Exh. 33 at p. 2, ¶ 1). On March 10, 2000, John McGovern mailed a letter to Robert Tunstall Secretary Treasurer of the National advising that the Executive Board had voted at the request of Weightman to waive the "local portion" of the dues increase scheduled for April in its entirety. (Rogoff Declaration, Exh. 32). The letter did not mention Bowie's alleged vote against the waiver. *Id.*

By letter dated March 13, 2000, Bowie protested the Weightman–McGovern mailing to Weightman. (Rogoff Declaration, Exh. 13). On March 14, 2000, Bowie also protested the mailing in a letter to Bruce Iverson ("Iverson"), the Election Committee Chair for the 2000 election ("the March 14th Protest"). (Rogoff Declaration, Exh. 3 at pp. 50, 53–58, and Exh. 14). President Weightman appointed Iverson to be Chair of the Election Committee for the 2000. (Second Rogoff Declaration, Exh. 3 at pp. 33). Iverson considered the March 14th Protest by Bowie to be timely. *Id.* at 61. Upon receipt of the March 14th Protest, Iverson requested a legal opinion from the local's counsel, Craig Livingston ("Livingston") of the law firm of Ball Livingston. (Rogoff Declaration, Exh. 3 at pp. 54–55). By letter dated April 3, 2000, Livingston wrote to Iverson with a copy to Bowie concluding that Bowie's protest on the dues waiver issue should be denied. (Rogoff Declaration, Exh. 3 at p. 58). Iverson took no further action concerning Bowie's protest of the mailing. Neither Bowie's protest, nor Livingston's April 3, 2000 letter was sent to the leadership. *Id.* Bowie received Livingston's letter on April

19, 2000. (Rogoff Declaration Exh. 5 at pp. 62–67, Exh. 16, and Exh. 22). On April 19, 2000, Election Chair Iverson sent a letter to the candidates stating:

> the Election Committee hereby extends the time in which you may file an objection to or appeal of this election to five (5) days from this date [April 19, 2000]. Any objection(s) must be received at the front desk of the NJAL office by 3:00 p.m. on Monday April 24, 2000.

(Second Rogoff Declaration, Exh. 9). Furthermore, Iverson told the candidates, including Bowie, that all appeals would be considered and not to worry about the time deadline. (Second Rogoff Declaration, Exh. 3 at pp., 39–43). By letter dated April 20, 2000, Bowie appealed the decision denying his March 14th Protest to the National Election Appeals Committee ("NEAC").[3] (Rogoff Declaration, Exh. 5 at pp. 51–53, and Exh. 16). The Weightman–McGovern mailing was also appealed to both the Local and the NEAC by Eddy Lanoue and Salim Ali, members of the third slate running the election. (Rogoff Declaration, Exh. 5 at pp. 77–80, Exh. 26, Exh. 27 at ¶¶ 3, 6 and Exh. 28 at ¶¶ 2, 4).

On March 22, 2000, Tom Martin a candidate on the Weightman–McGovern Real Deal slate filed a one page protest with NJAL Election Chair Iverson seeking to disqualify Bowie "because he is [sic] convicted of narcotics laws." (Rogoff Declaration, Exh. 3 at pp. 64–65, and Exh. 18). The protest about Bowie was not accompanied by an affidavit or supporting documents. (Second Rogoff Declaration, Exh. 3 at. pp. 64–65). Iverson sought and received a legal opinion from the defendant's counsel concerning Tom Martin's protest. (Rogoff Declaration, Exh. 3 at pp. 65–66). Defendant's counsel wrote a letter render-

---

**3.** The NEAC is the final authority for internal union appeals. (Rogoff Declaration, Exh. 5 at p. 40).

ing his opinion on March 27, 2000. (Rogoff Declaration, Exh. 3 at pp. 65–66 and Exh. 17). The opinion letter stated for purposes of the opinion, the following statement would be assumed to be true:

Dennis Bowie was convicted of loitering with the intent to purchase a Controlled Dangerous Substance (CDS) in the vicinity of 12th Avenue and E. 24th Street in Paterson, NJ on September 26, 1997.

(Rogoff Declaration, Exh. 17). The letter further explained that while the Labor Management Reporting and Disclosure Act does not permit someone who has been convicted of violations of narcotics laws within the past thirteen years to serve, it concluded that there was no controlling authority to permit the barring of a candidate for violation of a municipal ordinance. *Id.* Thereafter on March 28, 2000, Iverson sent a mailing enclosing the opinion letter in it entirety to all Local members. ("The Iverson Mailing"). *Id.* The Iverson mailing was created and paid for with union funds. *Id.* The cover letter of the Iverson mailing stated, in part, that the Election Committee had received a protest from Todd Martin contending that "Bowie should not be permitted because of an alleged municipal court violation." *Id.* The Iverson mailing concluded that "[o]n the basis of the conclusion of counsel and after due deliberations the Committee has decided that Dennis Bowie will be permitted to run for the office of President of the Local." *Id.*

After the election and on April 20, 2000, Bowie and Karen Ellerbee Robinson, a candidate on Bowie's New Millennium slate, sent a protest ("the April 20th Protest") to Iverson by overnight mail. (Rogoff Declaration, Exh. 1, pp. 91–93, Exh. 4 at pp. 211–212, Exh. 19). The April 20th Protest to the Iverson mailing raised a number of issues including the following:

Weightman inappropriately had the election committee mail out an erroneous letter concerning an alleged criminal conviction. The letter mailed out by the lawyer erroneously stated I was convicted of something I wasn't. Also that was not information that should have been shared with all the members especially at the UNION EXPENSE. This constituted campaigning with union funds and it adversely impacted myself and my whole slate.

(Rogoff Declaration, Exh. 19).[4] Iverson received the April 20th Protest by overnight mail on April 21, 2000 at his home address. (Exh. 30 at Response 15). Thereafter, Iverson mailed it to the NJAL office. *Id.* Bowie also delivered another protest letter dated April 24, 2000, ("the April 24th Protest") again raising the illegality of the Iverson mailing. (Rogoff Declaration, Exh. 2 at 12–14, and Exh. 20). The April 24, 2000 protest letter was signed for by Rose D'Amato at the Union's offices on April 24, 2000 at 2:35 p.m. *Id.* The incumbents did not give either the April 20th Protest nor the April 24th Protest to Iverson for consideration. (Second Rogoff Declaration, Exh. 3 at pp., 77–78).

Under the NJAL constitution, any member not paying dues for two executive months shall be notified as being in arrears by the Secretary–Treasurer. (Rogoff Declaration, Exh. 6 at p. 77, and Exh. 7 at Art. IV, Sec. 2) Only members in good standing with the NJAL were permitted to be candidates for office in the election. (Rogoff Declaration, Exh. 4 at pp. 28–29, 37, 50–52). Although McGovern examined the candidates' records to make sure they

**4.** The April 20th Protest letter also included a reference to the Weightman–McGovern mailing.

were members in good standing, he did not check to see whether the members who were voting were in good standing. (Rogoff Declaration, Exh. 4 at pp. 28–29, 37, 50–52, 97–98). Bowie was a member in good standing when he ran for president in 2000. (Second Rogoff Declaration, Exh. 4 at pp. 170–171 and Exh. 6 at p. 69). After he lost the election, Bowie returned to work at the Postal Service in May 2000. (Second Rogoff Declaration, Exh. 4 at pp. 160–161, 169–170). However due to a procedural glitch, Bowie's dues were not deducted when he returned. (Second Rogoff Declaration, Exh. 4 at pp. 173, 215–216, and Exh. 6 at pp. 55–57, 66–67, and Exh. 1 at pp. 16–17, 28–29, 61–62). Bowie was dropped from the Local's rolls for his dues delinquency in September or October 2000. (Second Rogoff Declaration, Exh. 6 at pp. 82–83). Bowie did not discover that his union dues were not being deducted until sometime in June 2001. (Second Rogoff Declaration, Exh. 1 at pp. 27–33). The Local never notified Bowie of his delinquency. (Second Rogoff Declaration, Exh. 39 and Exh. 6 at p. 91, and exh. 4 at p. 203). When Bowie discovered that dues were not being deducted, he tried to payback the dues but the Local refused to accept them. (Second Rogoff Declaration, Exh. 1 at pp. 21–22, 51–52, Exh. 4 at 176–177, and Exh. 29).

## STANDARD OF REVIEW

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325,

106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247, 106 S.Ct. 2505. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986).

In addition to being genuine, the disputed facts must be material, as determined by the substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Debate over extraneous issues will not suffice; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## DISCUSSION

■ Section 401(g) of the The Labor Management Reporting and Disclosure Act of 1959 (the "LMRDA"), 29 U.S.C. § 481(g), prohibits the use of union and employer funds in union election campaigns. *United Steelworkers of America,*

*AFL–CIO, CLC v. Sadlowski*, 457 U.S. 102, 117, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982). Section 401(g) states:

> (g) Use of dues, assessments or similar levies, and funds of employer for promotion of candidacy of person. No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter. Such moneys of a labor organization may be utilized for notices, factual statements of issues not involving candidates, and other expenses necessary for the holding of an election.

However, as a practical matter, incumbent officials must carry on business even in the midst of a heated election, including reporting to the membership on issues of general concern. *Donovan v. Metropolitan District Council of Carpenters*, 797 F.2d 140, 145 (3d Cir.1986). While publications are permissible to inform the membership, improper publications are those which "... exceed[ed] the bounds of permissible reportage on union matters ..." *Dole v. Drywall Tapers and Finishers Local Union 1976*, 733 F.Supp. 864, 867 (D.N.J.1990). "Considered under the totality of the circumstances, otherwise permissible statements may take on a different hue when viewed against the backdrop of an election campaign." *Dole v. Federation of Postal Police Officers Inc.*, 744 F.Supp. 413, 418 (E.D.N.Y.1990). To ascertain whether publications constitute promotion of a candidate in violation of section 401(g), the timing, tone, and content of the union's publication is evaluated. *Donovan*, 797 F.2d at 145; *Reich v. Local 843; Bottle Beer Drivers*, 869 F.Supp. 1142, 1148 (D.N.J.1994). The general circumstances surrounding the publication may also be considered. *Id.* at 1148.

■ The Secretary contends that the Weightman–McGovern mailing violated section 401 of the LMRDA, and submits that the timing, tone, and content of the mailing went well beyond any permissible purpose of informing the membership of the dues waiver. While the Local does not dispute that it created and sent the Weightman–McGovern mailing to the Local's entire membership using union funds in the heart of the campaign season, the Local submits that the mailings were not inappropriate because neither mailing urged members to vote against any particular candidate or slate, neither mailing questioned the qualifications or the ability of any candidate or slate, and neither mailing criticized any slate.

In contrast to the Local's position, the mailing was laudatory to incumbents Weightman and McGovern's position on the dues waiver, and isolated Weightman's opponent as in favor of the dues increase.[5] The mailing, written on the Local's stationary, bearing the names of Gary Weightman and John McGovern, included the statement that the Local's Executive Board "ADOPTS REQUEST OF PRESIDENT & Secretary Treasurer" to waive dues increase, and noted that the Executive Board had voted "overwhelmingly" to waive the local dues increase. The mailing

---

**5.** The design of the Weightman–McGovern mailing to promote one candidacy to the detriment of another is further established by comparing the mailing to McGovern's March 10, 2000 letter to Robert Turnstall, Secretary Treasurer of the National. In that letter, McGovern noted that the waiver was at the request of President Weightman. However it

did not identify Bowie as the only member of the Executive Board to vote against the proposal; did not mention that the Local was in good financial health; and did not have a caption in large lettering stating that the Local adopted the request of the President and Secretary Treasurer.

then pointed out in a footnote on the bottom of the page that "[o]nly Director of Industrial Relations David Bowie voted to raise the dues", and explained that Weightman and McGovern had recommended that the Executive Board waive the dues increase "since the good financial condition of the Local would allow this," and informed members that the battle against abusive management and postal privatization would continue. The Weightman–McGovern mailing, as evinced by its timing, tone, and content, is clearly campaign material.

Without the reference to David Bowie's alleged vote, the mailing may not have offended section 401(g) as the mailing does contain information which would be of interest to the union members. Of course, the manner in which members of the Executive Board vote is of interest to the union members. However, the union had never before revealed the individual votes of the Executive Board to the members, and the decision to waive dues could have been communicated to the members without mention of Bowie's vote. The reference to Bowie, although contained in a footnote, changes the nature of the mailing to campaign material. The mention of Bowie's vote viewed in the context of the timing, tone and content of the entire mailing suggests that its purpose was to promote the incumbents slate, and not merely to provide information.

■ As with the Weightman–McGovern mailing, the Local submits that the Iverson mailing was a wholly appropriate communication to its members. On the other hand, the Secretary argues that the timing, tone and content of the mailing went far beyond any permissible purpose of informing the membership and constituted impermissible campaigning. The Iverson mailing was mailed out on March 28, 2000, twenty days before the election ballots were to be returned. Thus, the timing of the mailing directly coincided with the receipt and return of ballots right in the heart of the campaign season. While the Local asserts that the eligibility of one of the candidates is a matter of concern for its members and the timing of the Iverson mailing was understandable in light of the timing of the protest and the scheduled time period for the election, the tone and content of the mailing provided gratuitous and damaging material against Bowie in the heart of the campaign season. Rather than simply announce a decision that Bowie would be permitted to run, the Local used funds to mail information which suggested that Bowie had a criminal conviction for intent to purchase a controlled dangerous substance in September 1997. Although the letter stated that for purposes of the analysis it would assume the allegation that Bowie was convicted of attempting to purchase drugs on September 26, 1997 was true, the mailing insinuated that the Bowie had a sordid past involved with drugs. The fact that the mailing was generated as a result of a protest does not excuse the violation since the content of the mailing went beyond what was necessary to inform the members of Bowie's eligibility.

The Local has the burden of proof to show that the violation did not affect the election's outcome. 29 U.S.C. § 482(c)(2); *Wirtz v. Hotel, Motel Employees Union, Local 6,* 391 U.S. 492, 505–509, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968); *Chao v. Local 54, Hotel Employees And Restaurant Employees,* 166 F.Supp.2d 109, 123 (D.N.J. 2001). The Local has failed to present evidence that the violation did not affect the election results. Accordingly, the election must be set aside and a new election

ordered.[6]

■ Furthermore, "[w]here a union member raises a section 481 challenge to a single election and the Secretary discovers that the same violation affected other elections, the Secretary may seek to set aside all the [affected] elections." *Martin v. Local 101*, Civ. No. 91–1871(RJD), 1992 WL 394175, *5 (E.D.N.Y. Dec. 9, 1992). The Secretary contends that Bowie's entire slate may have been affected by either violation, and thus a new election for all positions where the New Millennium slate fielded a candidate is required. It is undisputed that the candidates for union office ran together on slates, pooled their resource together as slates, and sent out numerous mailings together as slates. The mailings may have affected the willingness of members to vote for Bowie's slate members even though the ballots did not list the candidates by slate affiliation. Thus, a new election will be required for all offices where the New Millennium fielded a candidate for office.

As for the defendant's motion, the Local contends that the complaint must be dismissed because the complainants failed to fully exhaust internal union procedures available or that the protests were in an untimely manner.

The Local contends that both the April 20th and April 24th Protests were not properly appealed to the NEAC. However as pointed out by the Secretary in her brief, this assertion is belied by the NEAC's own documents and the testimony of an NEAC member and National officer actually handling the appeals to which

Bowie was a party. Thus, there is simply no basis for the Local's position.

■ Additionally, the Local contends that all the protests at issue were not properly supported by affidavits and supporting documents. However, the Local never rejected the protests because of the lack of affidavits or supporting affidavits, nor asked for supplementation of the protests. Furthermore, in contrast to the three protests filed by Bowie, Martin's protest about Bowie should have required evidentiary substantiation because it alleged a fact that was not within Iverson's knowledge. Yet, the Martin protest was considered without the evidentiary support the Local claims is required.

In *Wirtz v. Local 125, Laborers' Intern Union*, 389 U.S. 477, 484, 88 S.Ct. 639, 19 L.Ed.2d 716 (1968), the Supreme Court held that the Secretary has standing to include in her complaint any § 401 violation she has discovered as long as the union has had a "fair opportunity to consider and redress in connection with a member's initial complaint". The Court further opined that "Congress, having given the Secretary a broad investigative power, cannot have intended that his right to relief be defined by a complaining member's ignorance of the law or the facts or by the artlessness of the member's protest." *Id.* at 485, 88 S.Ct. 639. Furthermore in *Hodgson v. Local Union 6799*, 403 U.S. 333, 91 S.Ct. 1841, 29 L.Ed.2d 510 (1971), the Supreme Court held that "in determining whether the exhaustion requirement of § 402(a) has been satisfied, courts should impose a heavy burden on the union to show that it could not in any

---

**6.** Generally, courts have held that an immediate new election is required even when the next regularly scheduled election is less than a year away. See e.g., *Chao v. Local 54, Hotel and Restaurant Employees*, 166 F.Supp.2d at 125–126, n. 23; *Reich v. Local 843 Bottle Beer*

*Drivers*, 869 F.Supp. at 1154; *Dole v. Federation of Postal Police Officers Inc.*, 744 F.Supp. 413, 420–421 (E.D.N.Y.1990); *Brock v. Metropolitan District of Council Carpenters*, 653 F.Supp. 289, 293 (E.D.Pa.1986).

way discern that a member was complaining of the violation in question."(footnote omitted). In this regard, the defendant has not even argued that it could not in any way have discerned that a member was complaining about a violation in question.

■ Moreover, the Local contends that the Secretary should be foreclosed from pursuing allegations raised in the April 20th Protest because the protest did not arrive at the union offices until one day after the deadline. However, the Local's contention that the Secretary should be barred from pursuing the complaints contained in the April 20th Protest is untenable. The Court of Appeals has held that the failure to precisely follow procedural requirements relating to service is not dispositive. *Shultz v. Local 1291, ILA*, 429 F.2d 592 (3d Cir.1970)(filing the complaint with the Local president instead of the Local secretary was sufficient). Iverson received the April 20th Protest by overnight mail on April 21, 2000, well within the deadline. Additionally, the procedural requirements of a union's internal dispute resolution process may be waived by the union's failure to raise them during the protest process. *Donovan v. Local 126, IBEW*, 728 F.2d 610 (3d Cir.1984). Here, there is no evidence that the Local raised any procedural issues during the appeals process. Accordingly, the Local's defense as to timeliness is rejected.

■ Finally, the Local contends that the complaint should be dismissed because it alleges that Bowie failed to pay his dues from May of 2000 until late 2001, and as a result lost his good standing status. However, when a member's lack of good standing is as a result of a dues delinquency caused by an act or a failure to act by the employer or the union, the member will not be penalized. *Colpo v. General Teamsters Local Union 326*, 659 F.2d 399, 401 (3d Cir.1981). The Secretary has demonstrated that Bowie's failure to pay dues occurred as a result of a failure to act by the employer or union, and the Local does not dispute the Secretary's submissions in this regard. Additionally, even assuming *arguendo* that Bowie lacked good standing with the Local at the time he filed his complaints with the Secretary, it is undisputed that the April 20th Protest was signed by Bowie and Robinson, and there is no dispute that Robinson was a member in good standing at the time the complaint was filed. Because Robinson was unquestionably a member in good standing when she filed her complaint with the Secretary and the complaint Robinson signed encompassed both issues which Bowie had been protesting, the issues were properly before the Secretary. Thus, the Local's argument that the complaint should be dismissed on standing grounds is unavailing.

## CONCLUSION

For the reasons set forth herein, the plaintiff's motion for summary judgment is granted, the defendant's cross-motion for summary judgment is denied, and the plaintiff's cross-motion for summary judgment on the defendant's affirmative defenses is granted. An appropriate order will enter.